Herbert WELCOME,
Petitioner-Appellant,

v.

Frank BLACKBURN, Warden,
Louisiana State Penitentiary,
Respondent-Appellee.

No. 85–4546
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

July 3, 1986.

*Davis,* 679 F.2d 845, 851 (11th Cir.1982), *cert. denied,* 459 U.S. 1207, 103 S.Ct. 1198, 75 L.Ed.2d    44 (1983).

Drew Louviere, Baton Rouge, La., for petitioner-appellant.

Dracos D. Burke, Bernard E. Boudreaux, Jr., Asst. Dist. Attys., New Iberia, La., for respondent-appellee.

Before CLARK, Chief Judge, WILLIAMS, and HIGGINBOTHAM, Circuit Judges.

CLARK, Chief Judge:

Herbert Welcome was convicted of two counts of first degree murder in the shooting deaths of Dorothy Guillory and Wallace Maturin. Welcome received a death sentence for the slaying of Guillory and life imprisonment for killing Maturin. He exhausted his state post-conviction remedies and then filed a petition for writ of habeas

corpus in the district court. The district court initially stayed Welcome's execution but subsequently denied the petition and dissolved the stay. Welcome filed an application for a certificate of probable cause with this court which was granted on August 28, 1985. The matter has been held since that time pending a decision by the United States Supreme Court in *Grigsby v. Mabry,* 758 F.2d 226 (8th Cir.) (en banc), *cert. granted,* 474 U.S. ——, 106 S.Ct. 59, 88 L.Ed.2d 48 (1985), a case which would bear on one of Welcome's claims.

## I

The Supreme Court of Louisiana described the facts of the killings thus:

On August 21, 1981, defendant Herbert Welcome shot and killed his aunt, Dorothy Guillory, and her paramour, Wallace Maturin, outside the house in which defendant resided with his mother.

According to the testimony of eyewitnesses, as the victims, Guillory and Maturin, were visiting on the front porch of the house, Welcome quarrelled with Maturin about the ownership of a pocketknife. The argument developed into a scuffle between Welcome and Maturin in front of the house. Dorothy Guillory entered the struggle by striking Welcome several times on the head with her purse.

A hand gun Welcome was carrying fell to the ground. Guillory shouted for Maturin to get the weapon, but Welcome grabbed it first and began shooting. He fired upon Maturin three times at close range and Maturin fled around the corner of the house. Welcome followed and shot him several more times. Maturin died almost immediately from his wounds.

Defendant returned to the front of the house and called out threats to Guillory as he reloaded his weapon. Guillory fled through the house and down a nearby street. Defendant ran Guillory down

and shot her several times. She died three days later from multiple gunshot wounds.

*State v. Welcome,* 458 So.2d 1235, 1237–38 (La.1983).

Welcome pleaded not guilty and not guilty by reason of insanity. At trial he presented testimony by a psychiatric expert to the effect that although he was not legally insane, he was mentally retarded. An intelligence test indicated that he possessed the mind of an eight-year old.

## II

■ On appeal, Welcome contends that the trial court erred in charging the jury on insanity and intent. The court instructed the jury during the guilt phase of the trial that "any mental disability short of legal insanity, that is, inability to distinguish between right and wrong cannot serve to negate specific intent and reduce the degree of crime." Welcome argues that since intent was the lone disputed element at trial, this instruction created an irrebuttable presumption on a material element of the offense charged. It not only relieved the State of its constitutional burden of proving each element of the offense charged beyond a reasonable doubt but also stripped Welcome of the presumption of innocence and prevented him from presenting his only defense. Welcome contends that the instruction effectively precluded the jury from considering the testimony of his psychiatrists to the effect that his subnormal mentality impaired his ability to formulate the requisite intent, and thus denied him the right to present evidence.

The quoted portion of the charge which explained the legal definition of insanity is a proper statement of Louisiana law, *State v. Andrews,* 369 So.2d 1049, 1054 (La.1979), and is permissible as a matter of federal constitutional law. *Fisher v. United States,* 328 U.S. 463, 66 S.Ct. 1318, 90 L.Ed. 1382 (1946).[1]

---

1. Three circuits have upheld the action of state courts which follow the *M'Naughten* rule in excluding the proffer of psychiatric testimony to show diminished intent. *Wahrlich v. Arizona,* 479 F.2d 1137 (9th Cir.), *cert. denied,* 414 U.S. 1011, 94 S.Ct. 375, 38 L.Ed.2d 249 (1973);

In reviewing allegations of error in jury instructions, an appellate court must determine whether the charge, considered as a whole, properly enabled the jurors to understand the issues to be tried. There is no merit in this objection when viewed in the context of the overall charge; *a fortiori* it presents no basis for relief from a federal habeas court. The structure and composition of the charge separated the concepts of insanity and intent. The jury was clearly advised that, if so disposed, it could find Welcome both sane and not guilty of murder in the first degree by concluding that he had not formed the requisite intent.

### III

■ Welcome also challenges the Court's failure to instruct the jury in the penalty phase of the trial that they could consider the evidence of Welcome's mental defect not only in mitigation of his acts but also with regard to whether any aggravating circumstance was proven. The statutory aggravating circumstance advanced by the State in this case was that Welcome "knowingly created a risk of death or great bodily harm to more than one person." La.C.Cr.P. art. 905.4(d). Welcome argues that his mental condition was obviously relevant not only to whether he could have formed the intent to kill but also to whether he "knowingly created a risk of death ..." and the jury should have been told that it was free to consider his mental defect in this aspect of the penalty phase of the trial.

The State counters Welcome's argument with the assertion that the trial court had no obligation to provide such instructions *sua sponte*, and that Welcome failed to make a timely request for such an instruction. The State alternatively urges that the substance of such instructions was given. We hold that Welcome's failure to request an instruction to the jury on this issue or to object to the lack thereof renders his contention meritless. *Henderson*

*Muench v. Israel*, 715 F.2d 1124 (7th Cir.1983), *cert. denied*, 467 U.S. 1228, 104 S.Ct. 2682, 81 L.Ed.2d 878 (1984), and *Campbell v. Wain-*

*v. Kibbe*, 431 U.S. 145, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977).

### IV

■ Welcome attacks his conviction on the grounds that the "death qualified" jury that found him guilty did not contain a constitutionally adequate cross-section of the community. During Welcome's voir dire, the prosecution was allowed to excuse for cause seven prospective jurors with conscientious or religious objections to capital punishment. This procedure accorded with our decision in *Spinkellink v. Wainwright*, 578 F.2d 582, 594 (5th Cir.1978), *cert. denied*, 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979) (interpreting *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968)). The Eighth Circuit decided the question differently in *Grigsby v. Mabry*, 758 F.2d 226 (8th Cir. 1985) (en banc), ruling that the removal for cause of "Witherspoon-excludables" resulted in "conviction-prone" juries and violated the petitioners's constitutional right to a jury selected from a fair cross-section of the community.

In *Lockhart v. McRee*, —— U.S. ——, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), the Court held that "... the Constitution does not prohibit the states from 'death qualifying' juries in capital cases." The Court refused to apply the Sixth Amendment's fair cross-section requirement "to require petit juries, as opposed to jury panels or venires, to reflect the composition of the community at large." *Id.*

In addition, the Court went on to explain that even if they did feel compelled to apply the fair cross-section requirement to petit juries, they would not consider a death qualified jury to be a violation of the Sixth Amendment right to a jury comprised of a fair cross-section of the community. "The essence of a 'fair cross-section' claim is the systematic exclusion of 'a "distinctive" group in the community.' " *Id.* citing *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct.

*wright*, 738 F.2d 1573 (11th Cir.1984). *See also United States v. Lyons*, 731 F.2d 243 (5th Cir. 1984) (en banc).

664, 668, 58 L.Ed.2d 579 (1979). The Court did not view "Witherspoon-excludables" as a "distinctive group" for fair cross-section purposes. The jury selection procedures followed in choosing Welcome's liability phase jury will not sustain a constitutional attack on his conviction.

**V**

■ Welcome contends that his conviction of first degree murder is not supported by the evidence. For Welcome to be convicted of first degree murder in Louisiana under the facts of this case, the prosecution was required to prove that he had "a specific intent to kill or inflict great bodily harm upon more than one person." La. R.S. 14.30(A)(3). He asserts that his actions in separately pursuing and killing Maturin and Guillory do not fulfill the element. Welcome asserts Louisiana requires that to meet this requirement the accused intend by a single act to kill or inflict great bodily harm on more than one person. He insists that no rational trier of fact could have found that the elements of the offense were proved beyond a reasonable doubt and thus his conviction cannot stand.

Welcome's theory might have carried more weight before the Louisiana Supreme Court decided *State v. Williams*, 480 So.2d 721 (La.1985). The Louisiana case law preceding *Williams* had been less than crystal clear as to whether the statute was intended to be limited to the results of a single act. *See State v. Andrews*, 452 So.2d 687 (La.1984) and *State v. Stewart*, 458 So.2d 1289 (La.1984).

The Louisiana Supreme Court clarified the statutory language, however, in *Williams* when it decided that the aggravating circumstance set out in LSA.C.Cr.P. art. 905.4(d)[2] and the definition of first degree murder contained in La.R.S. 14:30(A)(3)[3] "should be construed similarly, despite the difference in statutory language." *Id.* at 726. The court concluded that both stat-

utes were intended to proscribe those murders

> in which the murderers specifically intended to kill more than one person and actually caused the death of one person and the risk of death or great bodily harm to at least one other person, all by a single act *or by a series of acts in a single consecutive course of conduct.*

*Id.* (emphasis added) Welcome's argument is foreclosed by *Williams*.

**VI**

■ Welcome contends that the statutory aggravating circumstance upon which the State relied in the penalty phase of his trial—that "the offender knowingly created a risk of death of great bodily harm to more than one person"—is unconstitutionally vague in that it fails to give notice of what behavior is proscribed. Welcome supports this attack with the same arguments he advanced in support of his previous argument. This challenge too must fail because, as Welcome's brief concedes, the Louisiana Supreme Court corrected any possible ambiguities in its prior interpretations of this statute in *State v. Williams*, 480 So.2d 721 (La.1985). In so doing, the court exactly defined the aggravated conduct proscribed, thereby eliminating the possibility of an overly broad interpretation of the statute. *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

**VII**

■ Welcome also claims that the aggravating circumstance relied on to justify the imposition of the death penalty duplicates one of the elements of the crime of which he was convicted: first degree murder. Welcome asserts that this allows a jury which had already convicted him of that crime to use part of their guilt determination to find the identical aggravating circumstance "as a matter of course"—just as the prosecutor urged them to do. This, he

---

**2.** "the offender knowingly created a risk of death or great bodily harm to more than one person."

**3.** "when the offender has a specific intent to kill or inflict great bodily harm upon more than one person...."

asserts, impermissibly heightens the danger that the death penalty will be wantonly or arbitrarily imposed contrary to *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). Welcome asserts that every statutory aggravating circumstance must serve to separate the few cases of first degree murder in which the death penalty is imposed from "the many cases of the crime in which it is not"; and thus to narrow the class of persons eligible for the death penalty. This claim is not well-founded.

*Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) approved as constitutional the Texas capital sentencing system that narrowed the categories of murderers that can be convicted of the underlying crime to those whose crimes which included well defined aggravating circumstances. The Court limited its approval, however, to a system that allowed the sentencing authority to consider mitigating circumstances. That is precisely what Louisiana provides for and what was done in Welcome's case.

Louisiana's inclusion as an element of the crime of first degree murder of the aggravating circumstance of committing multiple murders in a single consecutive course of conduct serves to cull out of the class of all murders, a small group which the State makes eligible for the death penalty. But finding that circumstance present in the course of determining guilt does not fix punishment. It only serves to permissibly advance the sentencing jury to the stage of weighing mitigating as well as aggravating circumstances in order to make an individualized determination of life or death based on the character of the individual and the circumstances of the crime. *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 2743–44, 77 L.Ed.2d 235 (1983). The finding of this aggravating circumstance as a part of the guilt determination process does not finally control the imposition of the death penalty. Such a finding only permits the death penalty to be considered. Furthermore, we note that the Louisiana Supreme Court has held that a jury is not compelled to find an aggravat-

ing circumstance was present merely because it found the accused guilty of murder, *State v. Knighton*, 436 So.2d 1141 (La.1983), *cert. denied*, 465 U.S. 1051, 104 S.Ct. 1330, 79 L.Ed.2d 725 (1984). In short, Louisiana does not enforce the sort of mandatory death penalty statute condemned in *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976).

An analagous argument was rejected by this court in *Gray v. Lucas*, 677 F.2d 1086 (5th Cir.1982). Gray argued that a defendant convicted of felony murder in Mississippi will automatically be eligible for the death penalty because one of the aggravating factors, commission of a murder in the course of a felony, will have already been proved. The court found that this contention mistakenly presupposed a constitutional requirement that the death penalty be imposed proportionately among the statutory aggravating factors. Instead, the Eighth Amendment only requires that the death penalty be consistently imposed among similarly situated defendants.

Welcome's charge that because Louisiana statutory scheme duplicates an aggravating circumstance in the underlying crime, it unconstitutionally fails to narrow the class of persons qualifying for the death sentence is sophistical. By classifying first degree murder as including certain aggravating circumstances the state has narrowed the class of those subject to the death penalty as effectively as if it allowed a broader class to be convicted but then limited those within the broader class who could be sentenced to death to only persons whose crimes are accompanied by specific aggravating circumstances.

## VIII

Welcome asserts that the jury based its imposition of the death penalty on the finding of an aggravating circumstance (murder committed in an especially heinous, atrocious or cruel manner) that was unconstitutionally vague and wholly unsupported by the evidence. This argument begins by noting the fact that the State

argued and presented evidence on only one aggravating circumstance—that the offender "knowingly created the risk of death or great bodily harm to more than one person," yet the trial court read, without explanation, the entire statutory list of aggravating and mitigating circumstances to the jury. As to the only conviction for which the death penalty was imposed—the murder of Guillory—the jury found both that Welcome "knowingly created the risk of death or great bodily harm to more than one person" and that the killing was "committed in an especially heinous, atrocious or cruel manner."

Where the jury finds at least one aggravating circumstance that was valid and supported by the evidence, this Court has ruled that the refusal to review the validity of additional aggravating circumstances found by the jury is permissible as long as the jury's finding of arguable invalid aggravating circumstances "affected none of petitioner's substantial rights." *Williams v. Maggio*, 679 F.2d 381 (5th Cir.1982). The Supreme Court sustained a death sentence imposed under similar circumstances in *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). There the Georgia Supreme Court had held one of the aggravating circumstances found by the jury was unconstitutionally vague. Because the sentence was adequately supported by two other valid aggravating circumstances, the Supreme Court found that the narrowing function served by statutory aggravating circumstances was properly fulfilled. The two valid findings "adequately differentiate[d] this case in an objective, evenhanded and substantively rational way" from the murder cases in which the death penalty was not imposed. *Id.* at 879, 103 S.Ct. at 2744. Similarly, the fact that Welcome's jury properly could find that he knowingly created a risk of death to more than one person validates their imposition of the death penalty in this case notwithstanding their additional finding regarding heinousness.

Welcome asserts that the jury's unwillingness to impose the death penalty for the murder of Maturin demonstrates that they imposed the death penalty for his killing of Guillory based solely upon a finding of heinousness. Under *State v. Culberth*, 390 So.2d 847 (La.1980), the aggravating circumstance of heinousness is satisfied only if the killing involves torture or the pitiless infliction of unnecessary pain on the victim. Welcome asserts that there was no proof that would satisfy this standard. Assuming this is so,[4] we find that the clear proof of the first aggravating circumstance—the killing of two persons in a consecutive course of conduct—is sufficient to demonstrate that the jury finding of heinousness was harmless error.

There is an additional safeguard against the arbitrary imposition of the death penalty in this case. The Louisiana Supreme Court engaged in an elaborate capital sentence review. The procedure as described in *State v. Welcome*, 458 So.2d 1235 (La. 1983) was as follows:

> Every sentence of death imposed in this state is reviewed by this court to determine if it is constitutionally excessive. In making this examination, this court determines whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, whether the evidence supports the jury's finding of a statutory aggravating circumstance, and whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. *Id.* at 1244.

The court found it reasonable for the jury to conclude that Welcome contemplated and caused the deaths of the two victims in a single consecutive course of conduct. In addition, the court made a

---

**4.** The proof showed that after killing Guillory's paramour, Maturin, in Guillory's immediate presence and hearing, Welcome shouted threats to her as he reloaded his weapon. Welcome then chased Guillory through the house and down a nearby street before proceeding to shoot her five times as she begged for mercy. The shots were so placed that she lived for three days.

detailed proportionality analysis which not only evaluated Welcome's background but all other first degree murder prosecutions in the district of the crime. On reconsideration after *Pulley v. Harris,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), a more detailed proportionality analysis was undertaken which went beyond the requirements of Louisiana statute to survey all reported first degree murder convictions involving multiple killings in the entire state since 1976. That survey indicated that juries generally recommended the death penalty when two or more persons were killed in similar murders. The Supreme Court concluded from its review of this record and its survey of other death penalty cases that the jury's recommendation was not reached arbitrarily and was not based on improper considerations. We agree. Any error in the court's inclusion in its instructions of a listing of all aggravating circumstances, or in the jury's inclusion in its verdict on punishment of a finding of heinousness, was harmless.

IX

■ Welcome finally contends that his death sentence should be set aside because portions of the prosecutor's closing argument were improper. Instead of emphasizing that the jury's duty is to decide whether death is the appropriate punishment in the specific case before them, Welcome alleges that the prosecutor relied on society's general interest in deterrence of crime, which violated Welcome's constitutional right to an individualized decision by the jury.

"In order for a defendant to establish that the prosecutor's remarks rendered his or her trial fundamentally unfair, he or she 'must demonstrate either persistent and pronounced misconduct or that the evidence was so insubstantial that (in probability) but for the remarks no conviction would have occurred.'" *Willie v. Maggio,* 737 F.2d 1372 (5th Cir.1984), citing *Fulford v. Maggio,* 692 F.2d 354, 359 (5th Cir.1982), *rev'd on other grounds,* 462 U.S. 111, 103 S.Ct. 2261, 76 L.Ed.2d 794 (1983). Welcome did not allege or establish either ground of error.

While the prosecutor's closing argument touched on the prospect of general deterrence, it also emphasized Welcome's actions and the jury's responsibility to make a sentencing determination that applied the death penalty to Welcome's individual case. *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). Welcome failed to carry his burden of establishing that the prosecutor's closing argument rendered his trial fundamentally unfair. *Willie v. Maggio,* 737 F.2d at 1390.

The judgment of the district court denying the writ of habeas corpus and dissolving the stay of execution is

AFFIRMED.