Antonio JAMES, Petitioner-Appellant,

v.

Robert H. BUTLER, Sr., Warden, Louisiana State Penitentiary, et al., Respondents-Appellees.

No. 86–3753.

United States Court of Appeals, Fifth Circuit.

Sept. 4, 1987.

Rehearing and Rehearing En Banc Denied Oct. 5, 1987.

Lemann, O'Hara & Miles, William J. O'Hara, III and Arthur A. Lemann, III, New Orleans, La., for petitioner-appellant.

Michael E. McMahon, Asst. Dist. Atty., New Orleans, La., for respondents-appellees.

Before CLARK, Chief Judge, GARWOOD and HILL, Circuit Judges:

## ON APPLICATION FOR STAY OF EXECUTION PENDING APPEAL AND FOR CERTIFICATE OF PROBABLE CAUSE

GARWOOD, Circuit Judge:

The district court denied Antonio James' petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in which James sought to set aside his Louisiana first degree murder conviction and death sentence. That court likewise denied James' application for certificate of probable cause under 28 U.S.C. § 2253. James has filed a notice of appeal to this Court from the denial of his habeas petition. The case is now before us on James' application to this Court for certificate of probable cause.[1] We deny the application for certificate of probable cause and accordingly dismiss James' attempted appeal.[2] In passing on James' application for certificate of probable cause, we are guided by the standard "that a certificate of probable cause requires petitioner to make a 'substantial showing of the denial of [a] federal right.'" *Barefoot v. Estelle,* 463 U.S. 880, 103 S.Ct. 3383, 3394, 77 L.Ed.2d 1090 (1983). *See also Fabian v. Reed,* 714 F.2d 39 (5th Cir.1983). In passing on the request for stay of execution, we apply the standard stated in *O'Bryan v. McKaskle,* 729 F.2d 991, 993 (5th Cir.1984). We hold that James has failed to make the required showing for a certificate of probable cause or to keep in force the stay of execution heretofore entered.

### Procedural and Factual Background

James was charged in a July 12, 1979 indictment with the first degree murder, on January 1, 1979 in Orleans Parish, Louisi-

ana, of Henry Silver, contrary to LSA–R.S. 14:30. Following a jury trial in the Orleans Parish district court on December 14, 15, and 16, 1981, he was found guilty as charged. The jury, on December 17, 1981, at the conclusion of the bifurcated trial's sentencing proceeding, recommended that James be sentenced to death and found the following statutory aggravating circumstances, namely: "the offender was engaged in the perpetration of an armed robbery" and "the offender was previously convicted of an unrelated murder and has a significant prior history of criminal activity." *See* LSA–C.Cr.P. art. 905.4(a), (c). On direct appeal, the Louisiana Supreme Court affirmed James' conviction and sentence, and the United States Supreme Court denied his petition for writ of *certiorari. State v. James,* 431 So.2d 399 (La.), *cert. denied,* 464 U.S. 908, 104 S.Ct. 263, 78 L.Ed.2d 247 (1983).

Thereafter, in November 1983, James filed a petition for habeas relief in the court below under section 2254 and, in June 1984, the court below dismissed that petition without prejudice for failure to exhaust state remedies. James then sought post-conviction relief in the Louisiana state courts and, such relief being denied, in late July 1984, filed the present section 2254 petition in the court below. The district court granted a stay of execution and set an evidentiary hearing, which was held on October 4 and 5, 1984, after James had filed an amended petition. On October 17, 1985, the district court issued a lengthy opinion rejecting each of James' claims, dismissing his petition with prejudice, and vacating the previously entered stay. James timely filed a motion for new trial and requested a stay of execution. Following a November 26, 1985 nonevidentiary hearing on these matters, the district court granted a stay of execution and took the

---

1. We heretofore stayed James' execution "until further order of this Court, in order to permit this Court to make an informed decision on James' application to this Court for a certificate of probable cause." That stay was granted in this initial federal habeas because the period of time between James' application to this Court and his scheduled execution was too brief to allow this Court to make any meaningful review of the record below and in the state trial.

James does not now have a pending execution date. Under Louisiana law, a new execution date must be not sooner than thirty days after the dissolution or vacation of a previous stay. LSA–R.S. 15:567(C).

2. We likewise dissolve the stay of execution previously entered by this Court. *See* note 1, *supra.* We grant James leave to proceed *in forma pauperis.*

motion for new trial under advisement. On September 17, 1986, the district court issued a memorandum opinion and order denying the motion for new trial and vacating the stay of execution.[3] James filed notice of appeal to this Court, and applied to this Court for a certificate of probable cause and a stay of execution pending appeal.

James has been represented by counsel at all stages of the state proceedings against him, as well as throughout all the proceedings in the court below and in this Court. Subsequent to our granting of an interim stay, James' counsel, and counsel for the state, have each filed briefs with this Court.[4] In addition to reviewing these, we have reviewed the record of the proceedings, trial and pre-trial, of James' state conviction and sentence, the opinion of the Louisiana Supreme Court affirming his conviction and sentence, and the proceedings below, including the transcript of the October 4 and 5, 1984 evidentiary hearing.

The state's evidence produced at trial tended to show that on January 1, 1975, James approached seventy-year-old Henry Silver, placed a gun to Silver's head and demanded his money. When Silver shouted for help, James shot him in the head near the right ear. He then rifled through Silver's pockets and removed a wallet containing thirty-five dollars. Silver died a few hours later after being taken to a local hospital. James was arrested on January 26, 1979, after having attempted an armed robbery earlier that day during which he was shot with the gun with which he had threatened the victim. In May 1979, he was convicted of the January 26, 1979 attempted armed robbery. He was subsequently sentenced to ninety-nine years' imprisonment for that offense, and the conviction and sentence were affirmed by the Louisiana Supreme Court. 395 So.2d 1368 (La.1981) (per curiam without formal opinion). In June 1979, apparently prior to being sentenced on the attempted armed robbery, James gave statements to probation and police officers which implicated him in the January 1, 1979 murder of Silver and also in the January 23, 1979 murder of Alvin Adams, likewise committed in the course of a robbery.

The same day that James was indicted for the first degree murder of Silver, he was also charged, in a separate indictment, with the January 23, 1979 first degree murder of Adams. The Silver indictment was number 271–107, and the Adams indictment was number 271–108. After a retrial following a mistrial (which occurred before the conclusion of the testimony), James was convicted of first degree murder in the Adams case on October 30, 1981 and was sentenced to life imprisonment. His conviction and sentence were affirmed by the Louisiana Supreme Court. 422 So.2d 1164 (La.1982) (per curiam without formal opinion). James was then, in December 1981, tried and convicted, and sentenced to death for the January 1, 1979 first degree murder of Silver.[5]

---

3. James moved for reconsideration and a further stay of execution, which motions were both denied October 27, 1986. On the same day, the district court granted James an extension of time in which to file notice of appeal under Fed.R.App.P. 4(a)(5). An order was also entered apparently granting a certificate for probable cause, but the following day the district court vacated that order and denied certificate of probable cause.

4. In fixing the briefing schedule, we directed counsel in pertinent part as follows:
"Although the briefs are to be directed to the certificate of probable cause issue, the parties are not restricted from arguing the merits of the issues; indeed, any issue that appellant feels has merit should be raised and adequately briefed and argued in the brief; and by the same token, the appellees' brief should argue and brief the reasons it believes the issues raised by appellant do not have merit and do not warrant the issuance of a certificate of probable cause."
Although the briefing schedule authorized a reply brief by appellant, none has been filed.

5. The instant section 2254 petition challenging the conviction and sentence for the Silver murder was filed July 27, 1984, and was given docket number 84–3694 in the district court. On the same day, James also filed in the same court a separate section 2254 petition challenging his conviction and sentence for the Adams murder, and this petition was assigned docket number 84–3695 in the district court. These cases were consolidated, whether for purposes of trial or for all purposes is not entirely clear, by the district court's October 4, 1984 minute entry. In any event, the only arguments which James presents to this Court in support of his application to it for certificate of probable cause relate to his conviction and sentence to death

Until James' June 1979 self-initiated statements to the probation department and the police, the authorities apparently had no information as to the identity of the perpetrator of either the Silver murder or the Adams murder. While James indicated he was involved in the robberies during the course of which these murders were committed, he maintained that the shooting was done by someone else—one Levon Price in the Silver incident and one Edgar Taylor in the Adams incident—and was not contemplated by him. James also indicated that the murder weapon in each instance was the gun which was taken from him in the January 26 attempted armed robbery. As reflected in his testimony at the sentencing phase of the Silver murder trial, James claimed that he, Taylor, and Price were riding in Price's car on January 26, and that Price gave James the gun and told him to hold it on the intended victim of that robbery while Taylor took his possessions. The Adams and Silver murders were investigated by different police officers, and in June 1979, separate statements were taken from James respecting each particular crime, each statement being taken by a different officer, although they were taken one after the other on the same day. Ballistics tests were then run on the gun recovered from the January 26 robbery, and comparisons made to the bullets retrieved from the bodies of Silver and Adams, which reflected that they were fired from the weapon James used in the January 26 attempted robbery.

James' brief in this Court raises five issues. The first is "[t]hat the trial court erred in not issuing a Certificate of Probable Cause in that substantial issues of law and constitutional rights were raised and cites the balance of his claims herein as grounds therefor." As we conclude, for the reasons hereinafter stated, that the other claims asserted by James do not warrant the issuance of a certificate for probable cause, we overrule this contention. The only four substantive complaints presented by James are in essence the following:

1. James claims that he has made a statistical showing that the capital sen-

tencing system in Louisiana is administered in a racially discriminatory manner because death sentences are more often imposed where the victims are white than where the victims are black. This is what has become known as the *McCleskey* issue. *See McCleskey v. Kemp,* —— U.S. ——, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987).

2. Complaint is made that during the sentencing hearing the prosecutor exhibited to the jury the tattoo on James' hand of the word "killer."

3. James asserts that the sentencing and appellate sentence review were improper because the aggravating circumstance found by the jury that "the ofender was previously convicted of an unrelated murder and has a significant prior history of criminal activity," was invalid in his case since the statutory provision making "a significant prior history of criminal activity" an aggravating circumstance was enacted after the offense in question was committed (though before trial) and since the Adams murder, the unrelated murder referred to, was committed after the Silver murder and the prosecution wrongfully caused the Adams case to be tried first.

4. James claims his counsel was ineffective both at the guilt or innocence stage and at the sentencing stage, as well as on appeal. His primary complaint relates to the claimed failure of counsel to adequately investigate James' alleged narcotic addiction, and to use it as a defense, to defeat the specific intent required for first degree murder, and as a mitigating factor at sentencing. The other claimed instances of inadequate representation are asserting insufficient objection to the prosecution's display of the tattoo; insufficient objection to the prosecution's trying the Adams case before the Silver case; and the failure to object to an ad hoc judge's hearing a portion of the testimony on the pre-trial motion to suppress James' June 1979 statements.

for the Silver murder, cause number 84–3694 below. Consequently, we are concerned only

with James' conviction and sentence for that offense.

We now consider each of these four claims in turn.

### McCleskey **Claim**

■ The underlying theory advanced in this claim has since been rejected by the United States Supreme Court in *McCleskey v. Kemp, supra.* As specifically applied to Louisiana, we have on many occasions rejected similar or identical attempted statistical proof of racial discrimination in the administration of that state's capital punishment laws. *See, e.g., Wilson v. Butler,* 813 F.2d 664, 674 (5th Cir.1987); *Moore v. Blackburn,* 806 F.2d 560, 564–65 (5th Cir. 1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1988, 95 L.Ed.2d 827 (1987); *Watson v. Blackburn,* 798 F.2d 872 (5th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1984, 95 L.Ed.2d 824 (1987); *Berry v. Phelps,* 795 F.2d 504 (5th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1986, 95 L.Ed.2d 825 (1987). Further, as the district court correctly observed, the statistics tendered by James in his motion for new trial are of less evidentiary value than those found inadequate by the Supreme Court in *McCleskey,* principally because the analysis here attempts to account for fewer variables.

James also points to the fact that he is, and Adams was, black, while Silver was white. This is insufficient, either alone or together with the statistics, to even arguably make a *prima facie* showing of discrimination. Of course, the two crimes though generally similar were not identical, and they were committed at different times and places and not in a single course of criminal conduct. More significantly, the cases were tried to wholly different juries on different occasions and the single, crucial prosecution eye witness was different in each case. Further, there is no claim, nor any evidence or suggestion in the record, that the prosecution did not make a bona fide effort to procure the death penalty in the Adams case. Nor is anything added by the fact that the Adams case was tried first. The offenses were committed

within approximately three weeks of each other, James' participation in each was first discovered at the same time, and the indictments in each were returned at the same time. Under Louisiana law, the district attorney has full authority to determine the order in which cases are tried. LSA–C. Cr.P. art. 61; *State ex rel. Eames v. Amiss,* 288 So.2d 316, 318 (La.1974). There is absolutely no evidence that the district attorney was influenced by racial considerations in the ordering of the trials, or in any other aspect of the case.[6] James' *McCleskey* contentions are without merit and present no grounds for certificate of probable cause or stay of execution.

### Tattoo

■ James' mother was a witness in his behalf at the guilt or innocence stage of the trial as well as at the sentencing. At the guilt or innocence stage, she replied affirmatively when the prosecution asked her on cross-examination whether James had a tattoo on his hand. The prosecution then asked, "What's that say?" to which she replied, "His name's too on there." Defense counsel then objected on grounds of irrelevancy, the court sustained the objection, and the matter was not further pursued. At the sentencing stage, the prosecution brought out, by cross-examination of James' sister, called as a defense witness, that James had a tattoo of "killer" on his hand, which the sister then stated he had had "since he's a little boy." Thereafter, on examination by defense counsel, James' mother, who had been called by the defense, testified that he had a number of tattoos, including "my name, his name and other things," and had had those put on when he was about thirteen or fourteen. Subsequently, James himself testified, and on cross-examination the prosecution had him exhibit to the jury the tattoo on his left hand, over objection by defense counsel. Although exhibition of an accused's tattoo has been upheld by Louisiana courts, *see State v. Crochet,* 354 So.2d 1288, 1295 (La.

---

**6.** The assistant district attorney in charge of the cases testified for the state at the October 1984 evidentiary hearing and unequivocally denied that race played any part whatever in his decision as to the ordering of the trials; James'

counsel did not cross-examine the assistant district attorney, or present any evidence suggesting that race played any part in the handling of the cases.

1978), James contends, without citation of supporting authority, that this is inappropriate for any purpose other than identification. We do not perceive any violation of James' federal constitutional rights. There was no exhibition of the tattoo or reference to its content during the guilt or innocence stage, and the defense counsel's objection at that stage was sustained. Louisiana law provides that "[t]he sentencing hearing shall focus on the circumstances of the offense and the character and propensities of the offender." LSA–C.Cr.P. art. 905.2. We do not consider that cross-examination of James' sister, who had testified essentially as a character witness in his behalf, respecting the tattoo deprived James of any federal constitutional right; nor did his subsequently being caused to display it after he had testified. In any event, the presence of this tattoo, which James had had since he was a young boy and over a decade prior to the offense in question, was clearly and beyond all question without influence on the ultimate outcome of the sentencing hearing. The evidence showed that James had deliberately shot his elderly robbery victim in the head near the right ear, and killed him, had also committed another murder in the course of a robbery of an elderly man, and had held the gun to the head of an attempted robbery victim and threatened to blow his brains out, all within the space of three and a half weeks, and all without provocation. Also, James otherwise had a significant criminal record. The tattoo claim clearly presents no ground for issuance of a certificate of probable cause or stay of execution.

### Invalid Aggravating Circumstances and Related Claims

As noted, James asserts that the sentencing and appellate sentence review were improper because the aggravating circumstance found by the jury that "the offender was previously convicted of an unrelated murder and has a significant prior history of criminal activity" was invalid in his case since the statutory provision making "a significant prior history of criminal activity" an aggravating circumstance was enacted after the offense in question was committed (though before trial) and since the Adams murder, the unrelated murder referred to, was committed after the Silver murder and the prosecution wrongfully caused the Adams case to be tried first.

■ At the sentencing stage of the trial, defense counsel objected to the submission of the statutory aggravating circumstance of "a significant prior history of criminal activity," LSA–C.Cr.P. art. 905.4(c), because this statutory aggravating circumstance had been added by amendment enacted in 1979 after the commission of the offense. In *State v. Jordan*, 440 So.2d 716 (La.1983), the Louisiana Supreme Court held that this aggravating circumstance could not be applied to offenses committed prior to the 1979 amendment. Further, in *State v. David*, 468 So.2d 1126 (La.1984), the Louisiana Supreme Court held that the "significant prior history of criminal activity" statutory aggravating circumstance was unconstitutionally vague. However, in the present case the Louisiana Supreme Court, in its review of James' sentence, expressly did *not* rely on the statutory aggravating circumstance found by the jury that "the offender was previously convicted of an unrelated murder and has a significant prior history of criminal activity." *James*, 431 So.2d at 405–06. In this connection, it is to be noted that the jury here found another statutory aggravating circumstance, namely, that "the offender [James] was engaged in the perpetration of an armed robbery." LSA–C.Cr.P. art. 905.-4(a). Clearly this aggravating circumstance was amply supported by the evidence in James' trial, and there has been no challenge to its legal validity as applied in this case.[7] Under Louisiana law, only one

---

7. We observe that in the present case this aggravating circumstance does not present the "double counting" issue, where an aggravating circumstance merely repeats an element of the underlying crime, which is presented in such cases as *Lowenfield v. Phelps*, 817 F.2d 285, 288–89 (5th Cir.), *cert. granted*, — U.S. —, 107 S.Ct. 3227, 97 L.Ed.2d 734 (1987). At the

time of the Silver murder, first degree murder was defined in Louisiana as "[f]irst degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm." LSA–R.S. 14:30, as amended and reenacted by Acts 1976, No. 657, § 1. Under the same enactment, first degree murder is punishable by death or life imprisonment.

aggravating circumstance need be found in order for the jury to be authorized to impose the death penalty. LSA–C.Cr.P. art. 905.3. However, even if one or more aggravating circumstance is found, the jury is not required to impose the death penalty, whether or not it finds any mitigating circumstance. *Id.* arts. 905.3, 905.6; *Wingo v. Blackburn,* 783 F.2d 1046, 1051 (5th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1984, 95 L.Ed.2d 823 (1987); *Glass v. Butler,* 820 F.2d 112, 114–15 (5th Cir.), *stay of execution denied,* —— U.S. ——, 107 S.Ct. 3202, 96 L.Ed.2d 689 (1987). The fact that an invalid statutory aggravating circumstance has been found does not constitutionally impair a death sentence under the Louisiana procedure where the jury has also found another aggravating circumstance which is supported by the evidence and is valid under the law and of itself suffices to authorize the imposition of the death penalty. *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); *Welcome v. Blackburn,* 793 F.2d 672, 678 (5th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1985, 95 L.Ed.2d 825 (1987); *Glass v. Blackburn,* 791 F.2d 1165, 1173 (5th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1985, 95 L.Ed.2d 824 (1987); *Celestine v. Butler,* 823 F.2d 74, 78 (5th Cir. 1987), *stay of execution denied,* —— U.S. ——, 108 S.Ct. 6, 97 L.Ed.2d 796 (1987).[8] The foregoing authorities likewise establish that in such circumstance appellate proportionality review is not invalidated, at least where the appellate court does not rely on the jury's finding of an improper statutory aggravating circumstance as such.

It is also to be noted in this connection that the mere fact that the statutory aggravating circumstance concerning a prior history of criminal activity or conviction of an unrelated murder, article 905.4(c), was partially or wholly invalid as a statutory aggravating circumstance, did not render inadmissible as a sentencing consideration James' murder of Adams and his January 26 attempted armed robbery. The Louisiana Supreme Court has made this clear as a matter of state law in numerous decisions, pointing to the provision of LSA–C. Cr.P. art. 905.2 that "[t]he sentencing hearing shall focus on the circumstances of the offense and the character and propensities of the offender." *See State v. Mattheson,* 407 So.2d 1150, 1163–64 (La.1982); *State v. Sawyer,* 422 So.2d 95, 103–04 (La.1982); *Jordan,* 440 So.2d at 718–20; *State v. Rault,* 445 So.2d 1203, 1215–16 (La.), *cert. denied,* 469 U.S. 873, 105 S.Ct. 225, 83 L.Ed.2d 154 (1984). Nor does the admission for consideration in sentencing of such evidence of the accused's other offenses, even though not relevant to a proper statutory aggravating circumstance, violate any federal constitutional right of the accused. *Barclay v. Florida,* 463 U.S. 939, 103 S.Ct. 3418, 3428, 77 L.Ed.2d 1134 (1983); *Stephens,* 103 S.Ct. at 2748; *Thompson v. Lynaugh,* 821 F.2d 1054, 1062 (5th Cir. 1987); *Rault v. State of Louisiana,* 772 F.2d 117, 134–36 (5th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 2905, 90 L.Ed.2d 991 (1986); *Milton v. Procunier,* 744 F.2d 1091, 1097 (5th Cir.1984). *See also United States v. Ochoa,* 659 F.2d 547, 549 (5th Cir.1981), *cert. denied,* 455 U.S. 959, 102 S.Ct. 1472, 71 L.Ed.2d 678 (1982);

*Id.* It was not until the 1979 amendment, effective June 29, 1979, that first degree murder was redefined to require something more than a specific intent to kill or inflict great bodily harm. Acts 1979, No. 74, § 1. Further, the district court's instructions to the jury at the guilt or innocence stage did not require the jury to find that James was engaged in the perpetration of an armed robbery in order to find him guilty of first degree murder, and the instructions in this respect were consistent with the above-noted Louisiana definition of first degree murder as it existed when the offense was committed. Consequently, the jury's finding of the statutory aggravating circumstance that the of-

fender was engaged in the perpetration of armed robbery, article 905.4(a), did not in any way duplicate what the jury had to find (and did find) in order to convict James of first degree murder. We further observe that, in response to the defense's motion for bill of particulars, James was notified prior to trial of the statutory aggravating circumstances on which the state intended to rely.

8. This, of course, is and has long been also the law in Louisiana. *See James,* 431 So.2d at 405 (citing cases); *State v. Ward,* 483 So.2d 578 (La.1986).

*United States v. Martinez*, 584 F.2d 749 (5th Cir.1978).

The fact that the Adams case was tried before the Silver case does not add anything to James' contentions in this regard. As we have already explained, neither Louisiana law nor the United States Constitution was violated by the prosecution's election to try the Adams case before the Silver case and, of course, the January 26 attempted armed robbery had already been tried before the authorities discovered that James was the perpetrator of the Adams and Silver murders.[9]

James' complaints respecting the effect on sentencing and appellate sentence review of the article 905.4(c) aggravating circumstance found by the jury, the evidence of the Adams murder and of the January 26 attempted armed robbery, and the order in which the offenses were prosecuted, are all without merit and do not present grounds sufficient for a certificate of probable cause or stay of execution.

### Ineffective Assistance of Counsel

James claims his counsel was ineffective both at the guilt or innocence stage and at the sentencing stage of his trial, as well as on appeal.[10] Before turning to consideration of James' particular claims in this regard, we observe that we have reviewed the full state record, and conclude that James was afforded effective representation. James' lead counsel at the Silver trial (Philip Johnson) had also represented him in the final Adams trial (which followed the mistrial), where the sentence was life imprisonment. This counsel had, prior to the Adams trial, tried at least five other capital cases, and many times that number of other major felonies. There was also another defense counsel in the Silver trial, who previously had been defense co-counsel in one capital case and had defended many major felonies. Most of the pre-trial representation in the Silver case was handled by another attorney, who likewise represented James at the initial Adams trial which resulted in the mistrial; however, at James' request, this attorney (who had tried over fifty capital cases) was removed from the case. On appeal of the Silver case, another attorney, whose primary experience was appellate, represented James.

Numerous pre-trial motions, including motions *in limine*, for individualized *voir dire*, for a bill of particulars, for discovery and inspection, and for suppression, were filed in the Silver case, and subsequent hearings were held on each of these motions, including evidentiary hearings on the suppression motions. There was also a pre-trial determination of James' competency to stand trial. Prior to trial, the defense had discovered virtually the entire prosecution case. Requested jury charges were submitted, and objections made to the charge as given. Objections were likewise made to questions asked by the prosecution, and to portions of its argument. Evidence was submitted at the guilt or innocence stage, and at sentencing, and vigorous argument was presented by the defense on both occasions. A coherent theory of defense was developed, namely, that James was not the triggerman. The lesser included offenses of second degree murder and manslaughter were submitted to the jury. Doubt as to whether James was the triggerman was also sought to be exploited at the sentencing. The sole eyewitness to the offense was Levon Price, who had accompanied James at the time. He testified that it was James who did the shooting, but there was no other direct evidence of this. James' June 1979 statement to the police, which was introduced in evidence, stated that Price did the shooting and this led to Price's arrest for the murder, although subsequently Price was charged as an ac-

---

9. At the guilt or innocence stage there was no evidence presented concerning the Adams murder, and the evidence in respect to the January 26 incident did not reflect that any offense was committed at that time, but merely showed that the weapon, later proved to be that which fired the bullet that killed Silver (and in the sentencing stage proved to be the weapon that fired the bullet that killed Adams), was acquired from James on January 26 (that James was then using it in an attempted armed robbery was only shown on sentencing).

10. Although reference is made by James to appellate representation, no specific claims that are distinguishable from those related to trial are urged, and our discussion is hence entirely in terms of trial representation.

cessory after the fact. However, the defense was able to somewhat impeach him by reason of the fact that a condition of his probation was that he "testify as a State's witness in the trial of Antonio James." Nine assignments of error were submitted on appeal to the Louisiana Supreme Court.

At the evidentiary hearing before the district court on October 4 and 5, 1984, extensive evidence was taken on James' claims of ineffective assistance of counsel.

James' first and primary claim of ineffective assistance of counsel is that his counsel failed to investigate and present evidence of James' allegedly drugged condition at the time of the commission of the offense, both as a defense to negate the required specific intent for first degree murder and as a mitigating factor, under LSA–C.Cr.P. art. 905.5(b) or (e).

With respect to this claim, the district court, expressly applying the standards set out in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), found in pertinent part as follows:

"James avers that his attorney, Philip Johnson, was ineffective in that he failed to investigate and pursue the only real and plausible defense in the case, *i.e.,* James' mental condition at the time of the crime, more specifically, James' drugged condition at the commission of both murders.

"However, it is abundantly clear that the so-called drug defense was not the only 'real and plausible' defense available to James. James himself maintained in his pre-trial statements, in his trial testimony and at the evidentiary hearing before the Court on October 4, 1984 that while he was admittedly present at both murders, he did not in fact kill either victim.[11] James has steadfastly contended that Edgar Taylor shot Mr. Adams and that Levon Price shot Mr. Silver. This defense was vigorously urged by counsel at both trials during the guilt and the penalty phases.

". . . .

"The only information available then and now regarding the nature and extent of James' drug use are James' own statements. As brought out in the evidentiary hearing, neither James nor his family conveyed any information relative to his drug habit to any of the five attorneys involved in James' defense from his initial arrest in 1979 through the state appeal level. Although three of the attorneys who testified at the evidentiary hearing stated that they had found references to James' drug use in the Orleans Indigent Defender Program investigator's notes or in the Charity Hospital records, nothing in James' behavior or in the information he conveyed to them gave them any indication that he was in fact a drug addict or that his possible addiction would have been a viable defense which merited investigation and presentation. All five attorneys agreed that such a defense would have been inconsistent with James' primary defense at the guilty phase. Only one of James' attorneys, Robert Ziblich, admitted that had he believed that such an addiction was present, it might have been used as a mitigating factor at the sentencing phase. However, even Mr. Zibilich [*sic*] stated that such a presentation to the jury would be risky at best.

". . . James had no criminal record for any drug related crime. His drug use had not been mentioned at the sanity hearing of June 11, 1981. James had never been treated for drug addiction. His mother and sister were unaware of his drug use. He denied having a drug or alcohol addiction when being booked into Parish Prison from Charity Hospital on February 9, 1979. (See Defense Exhibit No. 3). Despite James' claim that extraordinary medical measures had to be taken at Charity Hospital because of

11. We also observe that this is what James told Dr. Ritter, the psychiatrist who conducted the pre-trial competency examination. Further, although Dr. Ritter testified at the October 1984 hearing that James told him that "he had begun using drugs in 1978," Dr. Ritter further testified that James never told him that he had used drugs on the night of either murder or the attempted armed robbery. Dr. Ritter did not notice any marks on James' arms. James testified at the October 1984 hearing that he did not tell Dr. Ritter or any other psychiatrist about his drug use.

his drug use on the night of the [January 26] Hooten armed robbery, the Charity Hospital records fail to support this assertion. The Charity Hospital records have only a brief reference to his street drug use and record James' own statement that he had not used street drugs for three weeks prior to his admission to Charity Hospital. (See Defense Exhibit No. 6). Dr. Kenneth Ritter testified that intermittent drug use, such as reported by James, would not be consistent with a serious addiction. Doctor Ritter also testified that the ability to recall and relate some two years later the minute details of the crime, including a detailed description of the victim and the crime scene, as well as the conversations between the participants involved in the crime, would not be consistent with the behavior of a person whose capacity to formulate specific intent had been so affected by heavy drug use. (Evidentiary Hearing, Oct. 4, 1984). James himself could not give the Court any examples of how his behavior had been affected by his drug use other than that he participated in the armed robberies in order to obtain money to buy drugs. (Evidentiary Hearing, Oct. 4, 1984.)

" . . . .

"In light of the strength with which James maintained his defense and in view of the sparcity of the information available to his attorneys relative to his drug use, James' attorneys cannot be held ineffective for failing to pursue through further extensive investigation his drug use nor in their failure to present a so-called drug defense at the guilt phase, such defense being clearly antagonistic to the primary defense elected.

"Nor could it be said that failure to present the drug defense at the sentencing phase would have constituted a strategy error sufficient to undermine the fundamental fairness of the proceeding. Both Philip Johnson and Frank Larre', James' attorneys in the Silver case, testified that even if they had considered James' drug use history as having had merit, they would not have presented it as a mitigating factor at sentencing for

fear of its negative effect on the jury. Even had it been offered in mitigation, there is no reasonable probability that the presentation of a drug defense or of drug use as a mitigating factor would have changed the jury's conclusion in view of the overwhelming evidence of James' guilt and of the aggravating circumstances. *Willie v. Maggio*, 737 F.2d 1372 (5th Cir.1984). Clearly, any alleged failure to investigate and to present a different line of defense at James' sentencing hearing was the result of reasonable professional judgment. *Martin v. Maggio*, 739 F.2d 184 (5th Cir.1984); *Moore v. Magio*, 740 F.2d 308 (5th Cir. 1984)." (Material in brackets and footnote added.)

The findings of primary, historic facts embraced in the foregoing portions of the district court's opinion are fully supported by the record. Further, we agree with the district court's legal conclusions and analysis. We also point out that James' June 1979 statement to the police, describing precisely and in great detail the Silver murder-robbery (except having Price as the perpetrator rather than James) strongly suggests that James was in adequate possession of his mental faculties. Nor does this statement in any way assert that James was in a drugged condition at the time of the Silver murder. Neither Dr. Ritter, who found James competent to stand trial, nor any other expert stated that James' mental condition at the time of the Silver murder was probably adversely affected by drug use. All James said at the October 1984 hearing with regard to his mental condition at the time of the crimes was that he had been taking drugs, and that he was "more, you know, active" than "normal," which he explained as meaning "I wanted to be with the two fellows that I was with and the things that they was doing. I was with them at the time the crime happened and I wasn't working or anything like that." He explained the latter statement by saying, "I know I had to find some kind of way to support it [his "Ts and blues" drug habit] with money." James continued at the October 1984 hearing to maintain that he did not shoot either Silver or Adams.

■ The facts found by the district court demonstrate that counsel's failure to pursue investigation of possible drug addiction on James' part was not constitutionally deficient representation under *Strickland.* *Strickland* requires us to evaluate counsel's conduct from "counsel's perspective at the time" and to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* 104 S.Ct. at 2065. *Strickland* also teaches that we must apply "a heavy measure of deference to counsel's judgments" and recognize that "[c]ounsel's actions are usually based, quite properly, ... on information supplied by the defendant." *Id.* at 2066. Here the defense that James personally and consistently advanced was that he was not the triggerman. If a reasonable doubt could be raised on this score, he doubtless would have been convicted of no more than second degree murder and escaped the death sentence. Similarly, a lingering doubt on this score might well have influenced the jury not to impose the death penalty. On the other hand, James did not advise counsel that he did not know what he was doing because he was drugged. In these circumstances, it was reasonable for counsel to try the case on the theory of attempting to raise a doubt as to whether James, as opposed to Price, was the triggerman, instead of attempting to investigate and present evidence of drug addiction. In this respect, the present case is closely analogous to *Burger v. Kemp,* ─ U.S. ─, 107 S.Ct. 3114, 3122–26, 97 L.Ed.2d 638 (1987). We have likewise rejected similar attacks on counsel's performance in other cases. *See e.g., Johnson v. Cabana,* 818 F.2d 333, 340–43 (5th Cir.1987); *Moore v. Maggio,* 740 F.2d 308, 315–18 (5th Cir. 1984), *cert. denied,* 472 U.S. 1032, 105 S.Ct. 3514, 87 L.Ed.2d 643 (1985).

Further, *Strickland* teaches that even if counsel makes a professionally unreasonable error in representation, habeas relief is not required unless the petitioner carries his burden of showing that the error was prejudicial. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 104 S.Ct. at 2068. The ultimate question is whether "the result of the particular proceeding is unreliable because of a breakdown in the adversarial process." *Id.* at 2069. Here there has been no showing of prejudice under the *Strickland* standard. There is no reasonable probability that if the drug addiction evidence had been further investigated and presented that the result would have been different. Indeed, the evidence showed that if counsel had known about James' claimed drug addiction, they still would not have presented that evidence. Further, we hold that such would have been a reasonable professional decision. Moreover, even if such evidence had been presented, there is no reasonable probability that it would have changed the result as to guilt or innocence, for the evidence clearly showed that the triggerman knew what he was doing. The same considerations reflect that there is no reasonable probability that the result would have changed as to the sentence, particularly in light of the Adams murder and the January 26 attempted armed robbery, and James' otherwise lengthy criminal record. *See, e.g., Willie v. Maggio,* 737 F.2d 1372, 1394–95 (5th Cir.1984); *Moore v. Maggio,* 740 F.2d at 315–19. *See also Glass v. Blackburn,* 791 F.2d 1165, 1170–71 (5th Cir.1986), *cert. denied,* ─ U.S. ─, 107 S.Ct. 1985, 95 L.Ed.2d 824 (1987).

We find no merit to James' claims of ineffective assistance of counsel in this respect, and hold that it does not present grounds for a certificate of probable cause or stay of execution.

■ We likewise reject James' other asserted instances of inadequate representation.[12] James claims that his counsel did

─────────

12. The district court found in this respect as follows:

"Other alleged instances of incompetence on the part of James' trial and appellate attorneys as cited in petitioner's brief have not been shown to be lapses in rendering effective counsel nor indeed anything other than choices made as a result of the exercise of reasonable professional judgment. Petitioner has likewise failed to demonstrate how any particular action of his counsel caused sufficient prejudice to James to constitute ineffective assistance under the Constitution."

not adequately object respecting his tattoo. This matter was not explored at the October 1984 evidentiary hearing. We find no ineffective assistance of counsel in this regard. Counsel kept this out of evidence in the guilt or innocence phase, and mitigated it in the sentencing phase by evidence that James had had the tattoo since he was a young boy, and that it was one of many tattoos, including his mother's name and others. Moreover, there is no showing of prejudice in this regard both because there is no showing that further objection would have kept the evidence out and because there is no reasonable probability that had the evidence been kept out the result would have been different. This was simply not a significant matter.

■ Next, James complains that counsel did not sufficiently object to the Adams case being tried before the Silver case. Again, this was not explored at the October 1984 evidentiary hearing. Counsel did object to use of the Adams conviction on the ground that it was not yet final and that the retrial therein had not been timely, and also complained in a general way about the ordering of the trials. We cannot hold that counsel's performance in this regard was professionally inadequate, for there was and is no authority under state or federal constitutional law supporting the proposition that under the present circumstances the state was obligated to try the Silver case first. By the same token, even if counsel had further objected to the ordering of the trials, there is no basis for concluding that such an objection would have been successful; indeed, it plainly would not have been successful for Louisiana law leaves that matter to the election of the prosecutor, and the United States Constitution does not require otherwise. Finally, we note in this connection that the Louisiana Supreme Court reviewed James' conviction on the basis that the only statutory aggravating circumstance validly found was that the murder was committed while James was engaged in the perpetration of armed robbery, as provided in article 905.-4(a).

■ The last specific instance of claimed ineffective representation relates to the fact that a small portion of the evidentiary pre-trial hearing on the defense's motion to suppress James' June 1979 statements to the police was heard by an ad hoc judge, and it was not affirmatively shown that the judge who ultimately denied the suppression motion had been apprised of the testimony heard by the ad hoc judge.[13] This claim is wholly without merit. To begin with, there is absolutely nothing in the record to indicate that the judge making the ruling was *not* apprised of this testimony. The testimony in question itself occupies less than twenty-five double-spaced typewritten lines in the transcript, and could easily have been typed up for the judge making the ruling on the motion to suppress, or read to him by the court reporter. We note that just before this testimony was taken before the ad hoc judge, defense counsel stated, "I would suggest to the Court and the State that after this testimony is taken that it be typed up so that Judge Bagert [the judge who had been handling the case and who ruled on the suppression motion] may rule on it, so that he may have the benefit of all the testimony." Immediately after this the court stated, "So ordered." There is absolutely no reason to believe that this order was not followed. Moreover, the testimony was in all things favorable to the state, and hence defense counsel can hardly be faulted for not checking to be sure that the judge read it. If the judge did not read it, it would only have prejudiced the state, not the defense. There is no claim, and no evidence, that the ad hoc judge who heard this brief testimony was in any way disqualified or not authorized to do so. Nor was this testimony necessary to sustain the admissibility of the statements. This claimed instance of inadequate representation is wholly without merit.

We reject James' claims of inadequate representation of counsel. Taken singly and together, they are without merit and

---

**13.** Except for a brief (and unrebutted) reference by the lawyer who represented James on direct appeal that he had not noticed this but would

not have raised it if he had, because it was not prejudicial, this matter was not explored at the October 1984 evidentiary hearing.

do not justify the issuance of a certificate of probable cause or stay of execution.

### Conclusion

We have examined each of James' claims and find each to be without merit. James has not made a substantial showing of a denial of a federal right. Accordingly, we deny James' application for a certificate of probable cause, and therefore we dismiss his attempted appeal, and we vacate the stay of execution heretofore entered.

Application for Certificate of Probable Cause DENIED and Appeal DISMISSED. Stay of Execution VACATED.