Robert SAWYER, Petitioner-Appellant,

v.

Robert H. BUTLER, Sr., Warden, Louisiana State Penitentiary, Respondent-Appellee.

No. 87–3274.

United States Court of Appeals, Fifth Circuit.

June 30, 1988.

Order Granting Rehearing En Banc Aug. 25, 1988.

---

584

Catherine Hancock, Elizabeth W. Cole, New Orleans, La., for petitioner-appellant.

John J. Molaison, Jr., Dorothy Pendergast, Asst. Dist. Atty., Gretna, La., for respondent-appellee.

Before GEE, KING and DAVIS, Circuit Judges.

KING, Circuit Judge:

Robert Sawyer appeals from the district court's denial of his petition for writ of habeas corpus, and its concomitant entry of an order rescinding Sawyer's stay of execution. On appeal, Sawyer argues that his conviction for first degree murder should be reversed both because he was denied effective assistance of counsel and because the state trial court, by failing to comply with a state law requiring that counsel assigned in a capital case must have been admitted to the bar for at least five years, violated Sawyer's constitutional due pro-

cess and equal protection rights. In addition, Sawyer argues that the prosecutor's closing argument in the sentencing phase of his trial violated the eighth amendment by erroneously misleading the jurors concerning their role as the final arbiters of death. As we agree with the district court that Sawyer's challenges to his conviction and sentence do not warrant habeas relief, we affirm the district court's judgment.

1. The district court adopted the following statement of facts as set forth in the opinion of the Supreme Court of Louisiana in Sawyer's case:

> A series of bizarre and frightful events, which led to the death of Fran Arwood, occurred at the residence where defendant was living with Cynthia Shano and Ms. Shano's two young sons. Ms. Arwood was divorced from Ms. Shano's stepbrother, but remained friendly with her and often helped her by taking care of the children. Defendant had lived with Ms. Shano in Texas for several months and had professed an intention to marry her.
>
> On September 28, 1979, Ms. Arwood was staying with Ms. Shano and helping with the children while Ms. Shano's mother was in the hospital. Defendant and Ms. Shano went out for the evening. Defendant returned at about 7:00 o'clock the next morning with Charles Lane, whom defendant had apparently met in a barroom and had invited to the residence for more drinking and talking.
>
> Defendant and Lane continued their drinking while listening to records. At some time during the morning, Ms. Shano left to check on her hospitalized mother. When she returned, she noticed that Ms. Arwood was bleeding from her mouth. Defendant told Ms. Shano that he had struck Ms. Arwood after an argument in which he accused Ms. Arwood of giving some pills to one of the children.
>
> The reasons behind the events that followed are difficult to discern accurately from the record and more difficult to comprehend. However, defendant does not vigorously contest the fact that Ms. Arwood in his presence was beaten, scalded with boiling water and burned with lighter fluid, or that the ferocity of the attack and the severity of the injuries caused her to die several weeks later without ever regaining consciousness.
>
> After the original altercation during Ms. Shano's absence, defendant and Lane, for some unexplained reason, decided that Ms. Arwood needed a bath. When she resisted, defendant struck her in the face with his fist, and both men pummeled her with repeated blows. Ms. Shano objected, but defendant locked the front door and retained the key, threatening to harm Ms. Shano if she interfered or even revealed the incident.

## I.

Robert Sawyer ("Sawyer") is a state prisoner currently incarcerated at the Louisiana State Penitentiary in Angola, Louisiana. Sawyer and Charles Lane ("Lane") were charged with first degree murder for the gruesome slaying of Frances Arwood.[1] Both were ultimately tried separately. Sawyer was represented at trial by his

> Acting in concert, defendant and Lane dragged Ms. Arwood by the hair to the bathroom, stripped her naked, and literally kicked her into the bathtub, where she was subjected to dunking, scalding with hot water, and additional beatings with their fists. A final effort by Ms. Arwood to resist the sadistic actions of her tormentors resulted in defendant's kicking her in the chest, causing her head to strike either the tub or an adjacent windowsill with such force as to render her unconscious. Although she did not regain consciousness, defendant and Lane continued to use her body as the object of their brutality.
>
> Defendant and Lane dragged her from the bathroom into the living room, where they dropped her, face down, onto the floor. Defendant then beat her with a belt as she lay on the floor, while Lane kicked her. They then placed her on her back on a sofa bed in the living room. As Ms. Shano went to the bathroom, she overheard defendant say to Lane that he (defendant) would show Lane "just how cruel he (defendant) could be". When she reentered the living room, she was struck by the pungent smell of burning flesh. She then discovered that defendant had poured lighter fluid on Ms. Arwood's body (particularly on her torso and genital area) and had set the lighter fluid afire.
>
> Then, displaying a callous disregard for the helpless (and mortally injured) victim, defendant and Lane continued to lounge about the residence listening to records and discussing the disposition of Ms. Arwood's body. Lane fell asleep next to the beaten and swollen body of the victim.
>
> Shortly after noon, Ms. Shano's sister and nephew came to visit. When the nephew knocked insistently, defendant gave Ms. Shano the key to open the door, and she ran screaming to the safety of her relatives. Her excited ravings ("They've killed Fran and they're trying to kill me") were incomprehensible to her nephew and sister until they looked inside and saw the gruesome scene and Ms. Arwood's beaten and blistered body. They also saw defendant sitting with his feet propped up on the edge of the couch.
>
> In the meantime, Ms. Shano called for police and emergency units. When the authorities arrived, they took Lane and defendant to jail, and rushed Ms. Arwood to a hospital, where she subsequently died.

*State v. Sawyer*, 422 So.2d at 97–98.

court-appointed attorney, James Weidner ("Weidner"). Sawyer was originally represented by Wiley Beevers ("Beevers"). It was Beevers who had initially brought Weidner into the case by asking him to assist as co-counsel. Beevers subsequently withdrew from the case when Sawyer refused to accept a plea bargain offered by the prosecutor and Weidner was left as sole counsel. Upon receiving his appointment, Weidner informed the trial court that he was not a "death-qualified" attorney because he lacked five years experience as required for appointed counsel in capital cases by article 512 of the Louisiana Code of Criminal Procedure.[2] The trial court told Weidner to get an experienced counsel to "sit" with him. Weidner managed to secure some assistance from several other attorneys, but no "death-qualified" attorney was ever appointed as co-counsel. Neither party disputes the fact that the terms of article 512 were not complied with. Sawyer was convicted of first degree murder and sentenced to death by a jury on September 19, 1980.

His conviction and sentence were affirmed by the Louisiana Supreme Court. *See State v. Sawyer*, 422 So.2d 95 (La. 1982). Sawyer's petition for a writ of certiorari to the United States Supreme Court was granted and the case was remanded with instructions for the Louisiana Supreme Court to reconsider its ruling in light of *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). *See Sawyer v. Louisiana*, 463 U.S. 1223, 103 S.Ct. 3567, 77 L.Ed.2d 1407 (1983). On remand, the Louisiana Supreme Court again affirmed the death sentence, *see Sawyer v. Louisiana*, 442 So.2d 1136 (La. 1983), and Sawyer's subsequent petition for writ of certiorari was denied, *see Sawyer v. Louisiana*, 466 U.S. 931, 104 S.Ct. 1719, 80 L.Ed.2d 191 (1984). At this point, Sawyer sought state habeas relief which was ultimately unsuccessful. *See Sawyer v. Mag-*

*gio*, 479 So.2d 360 (La.1985); *Sawyer v. Maggio*, 480 So.2d 313 (La.1985).

Having exhausted his state remedies, Sawyer filed a federal habeas petition in the United States District Court for the Eastern District of Louisiana. In his petition, Sawyer argued, among other things, that he received ineffective assistance of counsel, and that the state trial court's failure to comply with article 512 violated his due process and equal protection rights. Moreover, Sawyer claimed that the prosecutor's closing argument in the sentencing phase of his trial erroneously misled the jury as to their role as the final arbiters of death and, therefore, violated the eighth amendment. After granting Sawyer a stay of execution, the district court assigned Sawyer's case to a magistrate for a hearing. On September 9, 1986, the magistrate submitted his proposed findings and recommended to the district court that Sawyer's petition be denied and the stay of execution be vacated. With respect to Sawyer's ineffective assistance of counsel claim, the magistrate concluded that Sawyer had failed to demonstrate that he was prejudiced by any of Weidner's allegedly deficient actions as counsel. As to the state trial court's non-compliance with article 512, the magistrate began by noting that the state trial judge, after the evidentiary hearing, concluded that the violation is not fatal to a capital conviction when the defendant actually received effective assistance of counsel. The magistrate, therefore, refused to reach the issue of whether Sawyer's due process and equal protection rights were actually violated "since any alleged breach of those rights was harmless beyond a reasonable doubt and, consequently, does not raise a federal constitutional question. *Chapman v. California*, 386 U.S. 18 [, 87 S.Ct. 824, 17 L.Ed.2d 705] (1967)." Finally, the magistrate concluded that the prosecutor's remarks in his closing argument during the penalty phase were

---

**2.** Article 512 provides, in pertinent part:
When a defendant charged with a capital offense appears for arraignment without counsel, the court shall assign counsel for his defense. Such counsel may be assigned earlier, but must be assigned before the defendant

pleads to the indictment. Counsel assigned in a capital case must have been admitted to the bar for at least five years. An attorney with less experience may be assigned as assistant counsel.

distinguishable from those condemned in *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), as violative of the eighth amendment. Moreover, after concluding that "[r]eference to possible appellate review should not result, in all cases, in an automatic reversal of a death penalty," the magistrate went on to conclude that since "there is no reasonable probability, that but for the prosecutor's alleged professional errors, the recommendation of the jury would have been different," resentencing would be inappropriate.

On April 8, 1987, the district court issued its ruling adopting the magistrate's findings and recommendations in an order incorporating several amendments to the magistrate's opinion.[3] The district court also examined, in greater detail, the question of whether *Chapman*'s harmless error analysis applies to the alleged constitutional violations in the instant case. The district court concluded that a *Chapman* analysis was appropriate since the state trial court's failure to appoint counsel with five years experience could not be classified as a violation of constitutional rights "so basic to a fair trial" as to preclude the harmless error inquiry. The district court found no merit in Sawyer's assertion that harmless error analysis can never be applied to due process or equal protection errors. Finally, the district court found that the state trial court's appointment of counsel with less than five years experience in the instant case was indeed harmless since the evidence against Sawyer was

so overwhelming as to establish his guilt beyond a reasonable doubt. Sawyer filed timely notice of appeal and was granted a certificate of probable cause to appeal and a stay of execution pending appeal. We have jurisdiction under Title 28, United States Code, section 2253.

## II.

On appeal, Sawyer raises three challenges to his confinement and sentence. First, Sawyer argues that he was accorded ineffective assistance by his "inexperienced appointed counsel, who was not lawfully qualified to represent a capital defendant," in violation of the sixth amendment. Next, Sawyer argues that the state trial court's failure to comply with article 512 violated Sawyer's constitutional due process and equal protection rights. He contends that the district court erred in applying a harmless error analysis to his claims for they are related to the integrity of the trial process itself and, as such, are not proper subjects for a *Chapman* inquiry. Finally, Sawyer contends that certain improper remarks by the prosecutor in closing arguments at the sentencing phase of Sawyer's trial erroneously misled the jury as to their role in the death penalty determination and, therefore, violated the eighth amendment as interpreted in *Caldwell*. Sawyer also takes issue with the district court's imposition of a prejudice requirement on his *Caldwell* violation claims. We will consider each of these arguments in turn.[4]

---

3. For the balance of this opinion, we will refer to the magistrate's findings and recommendations, as corrected by the district court, and the district court's additions to the magistrate's report collectively as the district court's conclusions.

4. Sawyer also argues briefly that since the jury was allowed to weigh an aggravating circumstance that was later held to have been improperly submitted, his death sentence was imposed in violation of the eighth amendment. Specifically, the jury found that Sawyer had previously been convicted of an unrelated murder because he was indicted in Arkansas for second degree murder in the killing of a child, and pled guilty to involuntary manslaughter for that crime. The Louisiana Supreme Court, however, ruled that a conviction for involuntary manslaughter could not support a finding that Sawyer had

previously been convicted of an unrelated murder. *Sawyer*, 422 So.2d at 101. The Louisiana Supreme Court concluded that the evidence of Sawyer's prior conviction was properly admitted, however, and did not inject an arbitrary factor into the sentencing proceeding. *Id.* at 104. Sawyer's argument to the contrary is of no moment. As we have stated:

The fact that an invalid statutory aggravating circumstance has been found does not constitutionally impair a death sentence under the Louisiana procedure where the jury has also found another aggravating circumstance which is supported by the evidence and is valid under the law and of itself suffices to authorize the imposition of the death penalty. *James v. Butler*, 827 F.2d 1006, 1013 (5th Cir. 1987); *see also Byrne v. Butler*, 845 F.2d 501, 501, 514–15 (5th Cir.1988).

## III.

### A. Ineffective Assistance of Counsel

Sawyer points to a number of alleged deficiencies in Weidner's performance at trial as support for his allegation of ineffective assistance of counsel. Specifically, Sawyer notes that Weidner: (1) failed to ask the jurors about their attitudes towards the death penalty during voir dire; (2) objected to the jury's learning of the mandatory life imprisonment penalty for second degree murder, as well as the penalty for manslaughter at the guilt phase; (3) failed to object to several inadmissible, inflammatory remarks by the prosecutor; (4) produced no defense experts on the subjects of intoxication and toxic psychosis even though he had chosen them as his chief defenses to negate the specific intent required for first degree murder; (5) failed to make a closing argument at the guilt phase of trial; and (6) failed to prepare a competent penalty phase presentation.

■■■ Sawyer's claims of ineffective assistance of counsel must be evaluated under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The test requires first, "a showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment," and second, a showing that the deficient performance so prejudiced the defense that the defendant was deprived of a fair and reliable trial. *Uresti v. Lynaugh*, 821 F.2d 1099, 1101 (5th Cir.1987) (quoting *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064). The burden that *Strickland* imposes on a defendant is severe. *Procter v. Butler*, 831 F.2d 1251, 1255 (5th Cir.1987). In order to satisfy the deficiency prong of the *Strickland* test, for example, the defendant must demonstrate

that counsel's representation fell below an objective standard of reasonableness as measured by prevailing professional standards. *Martin v. McCotter*, 796 F.2d 813, 816 (5th Cir.1986), *cert. denied*, — U.S. ——, 107 S.Ct. 935, 93 L.Ed.2d 985 (1987). Given the almost infinite variety of possible trial techniques and tactics available to counsel, we must be careful not to second guess legitimate strategic choices which may now, under the distorting light of hindsight, seem ill-advised and unreasonable. We have stressed that, "great deference is given to counsel, 'strongly presuming that counsel has exercised reasonable professional judgment.'" *Martin*, 796 F.2d at 816 (quoting *Lockhart v. McCotter*, 782 F.2d 1275, 1279 (5th Cir.1986), *cert. denied*, — U.S. ——, 107 S.Ct. 873, 93 L.Ed.2d 827 (1987)).

■■■ In evaluating whether counsel's alleged errors prejudiced the defense, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693, 104 S.Ct. at 2067. Rather, the defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068. "It is not our role to assume the existence of prejudice." *Czere v. Butler*, 833 F.2d 59, 64 (5th Cir.1987). On the contrary, *Strickland* requires that the defendant affirmatively prove prejudice. *Id.* *Strickland* also authorizes us to proceed directly to the question of prejudice. Therefore, if Sawyer fails to demonstrate prejudice, the alleged deficiencies in Weid-

Sawyer does not dispute that the jury properly found two other aggravating circumstances, namely that the crime was committed in a particularly heinous manner and that it occurred during the perpetration of arson. The Louisiana Supreme Court concluded that the evidence was clearly sufficient to support the jury's findings with respect to those aggravating circumstances, *Sawyer*, 422 So.2d at 101, and "[t]hat court's determination is entitled to great weight in our review," *Wingo v. Blackburn*, 786 F.2d

654, 655 (5th Cir.1986), *cert. denied*, — U.S. ——, 107 S.Ct. 1984, 95 L.Ed.2d 823 (1987). In fact, Sawyer does not argue that the evidence was insufficient to support the other aggravating circumstances. Those aggravating circumstances were sufficient to authorize the imposition of the death penalty and Sawyer has not challenged their legal validity in this case. Sawyer's sentence, therefore, was not constitutionally impaired by the submission of the invalid aggravating circumstance. *See Byrne*, at 515.

ner's performance need not even be considered. *See Strickland,* 466 U.S. at 698–99, 104 S.Ct. at 2070; *Schwander v. Blackburn,* 750 F.2d 494, 502 (5th Cir.1984). Since both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact, we must make an independent determination of whether the representation accorded Sawyer by counsel passed constitutional muster. *Ricalday v. Procunier,* 736 F.2d 203, 206 (5th Cir.1984); *Trass v. Maggio,* 731 F.2d 288, 292 (5th Cir.1984). With these considerations in mind, we now turn to the merits of Sawyer's contentions.[5]

■ With respect to Sawyer's objections to voir dire, we need not decide whether counsel's failure to question prospective jurors about their views on the death penalty was professionally unreasonable because Sawyer has failed to demonstrate prejudice. Sawyer does not dispute the fact that the State questioned the prospective jurors on this point. Rather, Sawyer asserts that because "the actual value of the rights [counsel] so casually sacrificed cannot be measured in concrete terms," *Strickland* would excuse his failure to affirmatively demonstrate—or concretely allege—prejudice from counsel's actions. Sawyer's novel interpretation of *Strickland* is unsupported by authority and runs counter to our interpretation of that case. Sawyer also alludes to the prejudice which resulted from counsel's failure to rehabilitate veniremen who were excused because of their views contrary to the death penalty. Sawyer fails, however, to demonstrate that rehabilitation was possible. Unsupported allegations and pleas for presumptive prejudice are not the stuff that *Strickland* is made of. We find no merit in Sawyer's allegations that counsel's voir dire performance constituted ineffective representation of counsel.

■ At trial, Weidner objected to the jury's learning of the mandatory life imprisonment penalty for second degree murder, as well as the penalty for manslaughter at the guilt phase. Sawyer asserts that he was prejudiced by this objection because "[w]ithout this information, the jury would never realize that a conviction for second degree murder carried a mandatory life sentence, so that a vote against first degree would both remove the possibility of a death sentence and also insure permanent incarceration." By objecting to the jury's receipt of this information, Sawyer argues, Weidner deprived his client of any realistic opportunity for a second degree murder conviction and a chance of avoiding the penalty phase of trial. The district court, however, concluded that Sawyer's argument was without merit since "it was possible for the jury to recommend a sentence of life imprisonment on his conviction of first degree murder," and because Sawyer's "contention that the jury might have returned a verdict of manslaughter, had it

**5.** In addition to his specific allegations of Weidner's ineffectiveness, Sawyer also contends that Weidner's failure to meet article 512's standards for death qualification rendered his assistance as counsel unreasonable *per se* under "prevailing professional norms." *See Strickland,* 466 U.S. at 688, 104 S.Ct. at 2065. Sawyer asserts that "prejudice from this form of inadequate representation may be presumed." We need not address the first contention for we do not agree with Sawyer that counsel's failure to meet the state law standard was presumptively prejudicial. In support of this proposition, Sawyer relies on language from *Strickland* to the effect that prejudice may be presumed: (1) where "prejudice ... is so likely that case by case inquiry is not worth the cost;" and (2) where the impairment of the sixth amendment right is "easy to identify and, for that reason ... easy for the government to prevent." *See id.* at 692, 104 S.Ct. at 2067. Sawyer's reading of *Strick-* *land* as establishing a generally applicable two-pronged test for presumptive prejudice is clearly in error. The Court in *Strickland* included the aforementioned language merely to illustrate why it presumes prejudice where there has been an actual or constructive denial of the assistance of counsel altogether, or where the state has prevented counsel from assisting the accused during a critical stage of the proceedings. *See id.* (citing *United States v. Cronic,* 466 U.S. 648, 659 & n. 25, 104 S.Ct. 2039, 2047 & n. 25, 80 L.Ed.2d 657 (1984)). The state trial court's failure to comply with article 512 did not result in an actual or constructive denial of the assistance of counsel. Therefore, we are unwilling to extend *Strickland's* limited relaxation of the prejudice requirement to the facts of this case. Sawyer's claims are subject to the general requirement that the defendant affirmatively prove prejudice.

known he could have received twenty years imprisonment, has even less support in light of the evidence."

Once again, Sawyer has failed to affirmatively demonstrate prejudice. He has not shown a reasonable probability that, absent Weinder's objection to the jury's learning of lesser penalties, the jury decision would have been different. We note first that the evidence adduced at trial was more than ample to support the jury's determination that Sawyer was guilty of first degree murder.[6] Moreover, Sawyer fails to demonstrate a reasonable probability that the jury would have returned a verdict of guilty to either of the lesser offenses. Finally, as for avoiding the penalty phase of trial in hopes of securing a term of life imprisonment, Sawyer had consistently refused to accept such an offer by way of a plea bargain.[7]

Next, Sawyer contends—however perfunctorily—that Weidner's failure "to object to inadmissible, inflammatory statements by the prosecutor" constituted an example of Weidner's prejudicial representation. Sawyer complains of Weidner's failure to object "to the prosecutor's use of facts not in evidence during voir dire, which facts were never established at trial." Specifically, Sawyer complains of references to the use of a hammer in the commission of the crime. The district court concluded that the prosecutor's reference to the hammer, when "viewed in perspective to the actual torture and brutality inflicted upon the victim, could have had only an inconsequential effect on the jury's verdict." Moreover, at trial, Weidner objected to the testimony of a state witness who alluded to the use of a hammer during the attack, and requested a mistrial. The trial court denied the request but instruct-

6. As the district court noted, "[Sawyer] did not seriously contest at trial his involvement in the beating and burning of the victim." In any event, the testimony of Cynthia Shano, an eyewitness to the incident, as well as the other testimony and physical evidence introduced at trial, provided a sufficient factual underpinning for the jury's verdict. The Louisiana Supreme Court found that: (1) "[t]here was ... ample evidence from which a rational juror could have concluded beyond a reasonable doubt that [Sawyer] was engaged in the perpetration of aggravated arson;" (2) Sawyer's actions evinced the specific intent to inflict great bodily harm; and (3) the evidence was "plainly sufficient" to support the conviction. *State v. Sawyer*, 422 So.2d at 99. "That court's determination is entitled to great weight in our review." *Wingo v. Blackburn*, 786 F.2d 654, 655 (5th Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1984, 95 L.Ed.2d 823 (1987).

Sawyer's chief defense at trial was that he lacked the specific intent to commit first degree murder due to intoxication. In reviewing this claim, the Louisiana Supreme Court concluded that "the jury reasonably rejected the defense." *State v. Sawyer*, 422 So.2d at 99. The Louisiana Supreme Court went on to hold that "[t]here was ample evidence from the testimony of the arresting officer and Ms. Shano from which a rational juror could have found that [Sawyer] acted with specific intent, despite his excessive consumption of alcohol." *Id.* Our review of the record shows this conclusion well supported by the evidence. Sawyer has failed to demonstrate otherwise.

7. Sawyer's assertions of prejudice are further belied by Weidner's testimony at the state habe-

as hearing. At the hearing, Weidner gave the following explanation for his actions:

A. ....

My reasoning was that I didn't want the jurors to know the penalty for manslaughter was, you know, was twenty-one years. I didn't want them to know that. And that was basically a concession to Robert Sawyer. He was—Robert was insisting that we argue for manslaughter. And in light of the facts of the case, you know, and I explained to Robert I had, you know, "You're asking me to blow whatever credibility I may be able to build with the jury by doing that, especially if they find out that it's a twenty-one year sentence. You know, it's a relatively light sentence: they're going to figure out real quick that you, you know, with the other things, that you could be out of jail relatively soon if they find you guilty of manslaughter."

So, kind of as a compromise between Robert, you know, I agreed we won't let them know what any of the penalties are. Let's try to set it up so that the jury knows that it's death or something else.

Q. So, Mr. Sawyer's anticipation in that area consisted of his instructing you to argue for manslaughter, and not for second degree murder?

A. Robert had consistently—he had been informed as late as the morning we began the trial that he could plead guilty to first degree murder without the death penalty. And he consistently refused and said "You tell them I will plead guilty to manslaughter and nothing else."

ed the jury that "until now there has been no testimony regarding any hammer by any other prior witness so I am going to ask you to disregard those comments and that statement by the witness and don't let that statement prejudice Mr. Sawyer in any way." Sawyer's assertion, therefore, is without merit.

■ Sawyer's next objection to Weidner's performance concerns counsel's use of expert testimony to support Sawyer's intoxication and toxic psychosis defenses. Sawyer complains that Weidner failed to secure his own expert witnesses and instead relied on "state" experts—psychiatrists who had been appointed to a pre-trial lunacy commission charged with determin-

ing whether Sawyer was competent to stand trial—who gave damaging testimony. Each of the psychiatrists in question examined Sawyer for approximately half an hour in connection with the competency proceeding and concluded that Sawyer understood the nature of the charges against him and could assist his attorney in his defense. Weidner was successful in eliciting testimony from them which supported the toxic psychosis defense.[8] In his habeas petition, Sawyer complains that these opinions were based upon a set of hypothetical questions only, and that Weidner should have procured an expert who could have testified as to the actual effect of alcohol on Sawyer. As the district court noted, "[Sawyer] does not suggest that type of

---

8. The following excerpts from the testimony at trial are instructive:

Q. [By Weidner to Doctor Albert DeVilliere] Doctor, on approximately September the 27th, 1979 at some time around the time of 8:00 o'clock in the evening, Robert Sawyer went out to various lounges and began drinking. He drank a combination of MD 20/20 wine, shots of straight whiskey, beer, continued drinking without sleep from say approximately 8:00 p.m. in the evening, all night, his condition has been described at approximately 7:00 a.m. the next morning on September 28 when arriving home he was staggering drunk, barely able to walk.
A. What time?
Q. Approximately 7:00 a.m. in the morning. This is after being drunk all night long, continued to drink MD 20/20 wine at that time. At some time during the next five to six hours some very heinous acts occurred. At approximately 1:30 in the afternoon Robert Sawyer was described as sitting on the floor with his legs crossed looking glassy eyed and appearing to be in a stupor. This description given by a lay person such as myself, not by any physician.
 . . . .
With the facts given to you from that hypothet, Doctor, can you render an opinion as to the condition you believe Robert Sawyer was in during the time.
A. Well based on this information it is very possible a person under a great deal of alcohol and drinking continuously and assuming that the condition described is described by a person is fairly reasonable, a fairly reasonable individual who can assess the situation, you could see he was somewhat of a toxic psychosis. That he was probably, you can't say definitely, but that he probably was suffering with a toxic psychosis.
 . . . .

Q. Doctor, a person who is suffering from toxic psychoses is it possible for them to form an intent or to actively desire something to happen?
A. If you make the diagnosis of toxic psychoses it would hardly be likely that that person could form intent to do anything but he is liable to act out in a number of different ways.
 . . . .
Q. Now Doctor, in layman's terms could a person in this state, in other words in the state we have described with this amount of alcohol be in a stupor, I'm talking about the layman's definition of forming an intent or actively desiring something to happen, could they do that?
A. If you describe a person having the toxic psychoses it is highly unlikely they would be able to do that. Then you have, they could form intent in doing things, their behavior would not be erratic. They could have planned out behavior.
 * * * * * *
Q. [By Weidner to Doctor Genevieve Arneson] Would you give us that opinion?
A. Well it is my opinion if Mr. Sawyer drank that much alcohol and his behavior towards the victim is as described by witnesses—
Q. Speak up.
A. Mr. Sawyer had drank that much alcohol and his behavior toward the victim is as described by witnesses, if his behavior is that described by a police officer who came to the house after they were called and he was simply sitting there, with his feet up near the head of the victim, then it would be my opinion that he was, he was psychotic and it was a toxic psychosis secondary to the alcohol.
Q. Doctor, when a person is in a toxic psychosis are they able to form intent?
A. No, not in the usual sense.

examination would produce the type of results he seeks or that those results would even be obtainable." In addition, Doctor Albert DeVilliere, one of the two experts, testified both at trial and during the sanity hearing that a physician would have to have been at the scene of the crime during its commission to be in a position to render an opinion on Sawyer's intent or the effect of toxic psychosis on that intent at the time of the crime. Finally, as the district court concluded, Sawyer has failed to demonstrate sufficient evidence that he suffered from toxic psychosis to support his claims. His assertions on this point, therefore, are without merit.

Sawyer also points to Weidner's waiver of closing argument at the guilt phase of trial. Sawyer asserts that "[a] failure to give a closing argument constitutes a clear breakdown in the adversary process under [*Strickland*] as the jury must infer that the defense counsel who waives argument has abandoned his client's case, and has nothing to say because he believes him to be guilty." Weidner testified during the state evidentiary hearing that his deliberate decision to dispense with closing argument was based on two separate considerations. First, having dealt with the prosecutor in other trials, Weidner knew that the prosecutor tended towards "mild" closing arguments and "saved all of his big guns" for rebuttal. Therefore, "all [Weidner] could see closing argument was going to do in the guilt phase of the trial was give [the prosecutor] a chance to come back behind [him], show them the picture again ... and just make it worse." Second, Weidner realized the strong case the state had against Sawyer as to his guilt and felt that the best hope for salvaging anything for Sawyer was in the penalty phase, where Weidner hoped for a recommendation of life imprisonment. To further any possibility for success in the penalty phase, Weidner decided not to risk his credibility with the jury by advancing arguments that the jury might perceive as unsupportable.

 The district court concluded that "[w]hile an attorney's decision to waive closing argument might ordinarily deprive a defendant of the effective assistance of counsel, we do not find that to be the result in the case before us." We agree that the waiver of closing argument was not prejudicial on the facts before us. Weidner believed the evidence against Sawyer to be "overwhelming." That view seems to have been shared by all of the attorneys familiar with the case. Beevers, for example, was "convinced that there was overwhelming weight of evidence" against Sawyer and "[he] was concerned ... about the high probability of a death penalty should [Sawyer] proceed to trial." Samuel Dalton, an attorney who testified for Sawyer at the state habeas evidentiary hearing, also recalled "that the evidence of the homicide was overwhelming." Moreover, we note that closing argument was not needed to organize and explain the defense position. The district court concluded that, "[u]nder the circumstances, the jury could not help but to have understood the nature of Sawyer's defense." After a thorough review of the record, we find no error in the district court's conclusion that the jury was fairly apprised of the nature of Sawyer's defense during voir dire and Weidner's opening statement, and that the testimony of defense witnesses as to aspects of the defense theory was simple and direct.

Sawyer's assertions of prejudice are unsupported by the record. He has failed to demonstrate what counsel might have said at closing that would have a reasonable probability of changing the result of the trial and therefore, in light of Weidner's tactical considerations and the strong evidence against Sawyer, we are unprepared to find that the waiver of closing argument here was prejudicial.

 Finally, Sawyer contends that Weidner failed to prepare a competent penalty phase presentation. Specifically, Sawyer points to Weidner's alleged failure to conduct sufficient investigation and uncover relevant mitigating evidence. Sawyer fails, however, to specify what other mitigating evidence was available or how that evidence could have affected the jury's decision. For example, Sawyer complains that Weidner could have called other family

witnesses who would have been available to testify about mitigating circumstances. Yet, Sawyer neither describes the substance of that potential testimony nor details how the evidence uncovered would have done more than simply duplicate the testimony of Sawyer's sister and brother-in-law. He also complains that Weidner did not spend enough time preparing the witnesses to testify. It is clear, however, that brevity of consultation is insufficient to warrant habeas relief. *Schwander*, 750 F.2d at 499.

■ Sawyer also points to Weidner's closing argument as an example of attorney incompetence. In that closing, Weidner reiterated several dominant themes of his case: (1) that the jury bears a great responsibility and that they should be lenient by not "killing" Sawyer; (2) that the death penalty is improper under any circumstances; and (3) that Sawyer lived through a difficult childhood, had been in a mental hospital and had been drunk during the commission of the offense. While Weidner's closing was, as the district court noted, cursory and perfunctory, Sawyer has failed to affirmatively demonstrate prejudice. The closing was adequate to inform the jury of the defense's position. In addition, Sawyer has not articulated how Weidner's closing affected the jury's decision or could have been improved. Weidner's penalty phase presentation was imperfect but Sawyer has failed to demonstrate that it was constitutionally improper under *Strickland.*

For the foregoing reasons, we conclude that since Sawyer has failed to affirmatively demonstrate prejudice from any of Weidner's allegedly deficient actions as counsel, Sawyer's ineffective assistance claim must fail.

## B. Equal Protection and Due Process

Sawyer claims that the state trial court's refusal to comply with the terms of article

512 violated his rights to equal protection. We need not, and most certainly do not, reach the question of whether this violation of state law actually rose to the level of an equal protection violation. Even if Sawyer could prove an equal protection violation, that violation would still be subject to a harmless error analysis and, under such an analysis, would clearly fail.

In *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the Supreme Court rejected the notion that errors of constitutional dimension necessarily require reversal of criminal convictions. *Id.* at 21–22, 87 S.Ct. at 826. Since *Chapman,* the Court has "repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *see also Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 3105, 92 L.Ed.2d 460 (1986). Despite the strong interests that support the harmless error doctrine,[9] however, the Court has recognized that some constitutional errors require reversal without regard to the evidence in the particular case. *Rose,* 106 S.Ct. at 3106. This limitation recognizes "that there are some constitutional rights *so basic to a fair trial* that their infraction can never be treated as harmless error." *Chapman,* 386 U.S. at 23, 87 S.Ct. at 827–828 (emphasis added).

■ The Court in *Rose* sought to clarify this notion:

The State of course must provide a trial before an impartial judge, with counsel to help the accused defend against the State's charge. Without these basic protections, a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or inno-

---

**9.** As the Court stressed in *Van Arsdall:*
 The harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, and promotes public respect for the criminal process

by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.
*Van Arsdall,* 475 U.S. at 681, 106 S.Ct. at 1436 (citations omitted).

cence, and no criminal punishment may be regarded as fundamentally fair.

*Rose,* 106 S.Ct. at 3106 (citations omitted). Harmless error analysis, therefore, "presupposes a trial, at which the defendant, represented by counsel, may present evidence and argument before an impartial judge and jury." *Id.* (citing *Van Arsdall,* 475 U.S. at 681, 106 S.Ct. at 1436). As the Court stated in *Rose,* "[e]ach of the examples *Chapman* cited of errors that could never be harmless either aborted the basic trial process, or denied it altogether." *Rose,* 106 S.Ct. at 3106 n. 6. Therefore, "while there are some errors to which *Chapman* does not apply, they are the exception and not the rule. Accordingly, if the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless error analysis." *Id.* at 3106–07. Sawyer has failed to overcome that presumption.

We agree with the district court that a state law right to "death-qualified" counsel of five years experience is not included in *Chapman*'s "basic to a fair trial" category. Sawyer concedes that the right to a five year attorney is not itself a federal constitutional right. He argues, however, that "the state's arbitrary abrogation of that right may give rise to an equal protection ... violation." This federal constitutional right, the argument continues, is basic to a fair trial under *Chapman* "in the context of a breakdown in the state-guaranteed trial machinery in a capital case." We do not agree. The alleged constitutional violation in the instant case neither aborted the basic trial process nor denied it altogether, for Sawyer received the effective assistance of counsel.[10] "The thrust of the many constitutional rules governing the conduct of criminal trials is to ensure that those trials lead to fair and correct

judgments." *Id.* at 3107. Recognizing that "the Constitution entitles a criminal defendant to a fair trial, not a perfect one," *Van Arsdall,* 475 U.S. at 681, 106 S.Ct. at 1436, we conclude that the state trial court's failure to comply with article 512 does not compare with the kind of errors that have been found to automatically require reversal of an otherwise valid conviction. Sawyer's equal protection claim, therefore, was properly subjected to a harmless error analysis by the district court.

 Having determined that a harmless error analysis is appropriate in this case, we must turn to the question of whether the state trial court's appointment of counsel with less than five years experience was indeed harmless. An error is harmless where, after reviewing the facts of the case, the evidence adduced at trial, and the impact the constitutional violations had on the trial process, the evidence remains not only sufficient to support the verdict but so overwhelming as to establish the guilt of the accused beyond a reasonable doubt. *United States v. Hastings,* 461 U.S. 499, 512, 103 S.Ct. 1974, 1982, 76 L.Ed.2d 96 (1983); *Germany v. Estelle,* 639 F.2d 1301, 1303 (5th Cir. March 1981), *cert. denied,* 454 U.S. 850, 102 S.Ct. 290, 70 L.Ed.2d 140 (1981); *Harryman v. Estelle,* 616 F.2d 870, 876 (5th Cir.), *cert. denied,* 449 U.S. 860, 101 S.Ct. 161, 66 L.Ed.2d 76 (1980). Given the overwhelming evidence of guilt presented at Sawyer's trial, we agree with the district court that the state trial court's error was harmless beyond a reasonable doubt. Sawyer's equal protection claim, therefore, must fail.

 Sawyer's due process claim is also meritless. Where there has been a violation of state procedure, the proper inquiry "is to determine whether there has

---

10. The Court in *Rose* placed a great deal of emphasis on the error's potential effect on the factfinding process at trial. *Rose,* 106 S.Ct. at 3106. Specifically, the Court emphasized the deleterious effect which errors such as judicial bias or denial of counsel might have on the composition of the record. *Id.* at 3107 n. 7. Where the error in question does not affect the record, "[e]valuation of whether the error preju-

diced respondent ... does not require any difficult inquiries concerning matters that might have been, but were not, placed in evidence." No such difficult inquiries are required in the instant case. The failure to appoint five year counsel did not affect the composition of the record in such a way as to prevent an appellate court from evaluating the potential harm to Sawyer.

been a constitutional infraction of the defendant's due process rights which would render the trial as a whole 'fundamentally unfair.'" *Manning v. Warden, Louisiana State Penitentiary,* 786 F.2d 710, 711–12 (5th Cir.1986) (quoting *Nelson v. Estelle,* 642 F.2d 903, 906 (5th Cir. Unit A April 1981)). In order to show that his trial was fundamentally unfair, Sawyer must demonstrate that some prejudice resulted from the state trial court's failure to appoint counsel with five years experience. *See Manning,* 786 F.2d at 712. As we explained earlier, Sawyer has failed to demonstrate prejudice and, therefore, his claim must fail.[11]

## C. Caldwell Violation [12]

Finally, Sawyer maintains that certain remarks by the prosecutor in closing argument at the punishment stage of his trial violate the rule of *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) and require that his sentencing process be redone.

*Caldwell* is a rule of narrow application. It applies only to comments that mislead a jury in the capital sentencing process by inducing it to feel less responsible than it should for the sentencing decision. *Darden v. Wainwright,* 477 U.S. 168, 183–84 n. 15, 106 S.Ct. 2464, 2473 n. 15, 91 L.Ed.2d 144, 159 n. 15. The rule is well illustrated by the case in which it was laid down.

In *Caldwell,* the defendant had murdered the female proprietor of a small, rural bait and grocery store in the course of a robbery. Defense counsel, unable to find much comfort in relevant fact or law, took refuge in rhetoric, dwelling at some length on the Sixth Commandment, the Savior, the Crucifixion, mercy, forgiveness and certain of the less desirable aspects of being electrocuted. In response, the prosecuting attorney attacked the defense for cynically heaping undue responsibility upon the jury, while the judge concurred—overruling an objection to the argument and directing its continuance:

ASSISTANT DISTRICT ATTORNEY: Ladies and Gentlemen, I intend to be brief. I'm in complete disagreement with the approach the defense has taken. I don't think it's fair. I think it's unfair. I think the lawyers know better. Now, they would have you believe that you're going to kill this man and they know—they know that *your decision is not the final decision.* My God, how unfair can you be? *Your job is reviewable. They know it.* Yet the ...

COUNSEL FOR DEFENDANT: Your Honor, I'm going to object to this statement. It's out of order.

ASSISTANT DISTRICT ATTORNEY: Your Honor, throughout their argument, they said this panel was going to kill this man. I think that's terribly unfair.

THE COURT: Alright, *go on and make the full expression so the Jury will not be confused.* I think it proper that the jury realizes that it is *reviewable automatically* as the death penalty commands. I think that information is now needed by the Jury so they will not be confused.

ASSISTANT DISTRICT ATTORNEY: Throughout their remarks, they attempted to give you the opposite, sparing the truth. They said "Thou shalt not kill." If that applies to him, it applies to you, *insinuating that your decision is the final decision* and that they're gonna

---

**11.** In the instant case, the district court applied a harmless error analysis to Sawyer's due process claims and found that any alleged violation was in fact harmless. We have found that there was no due process violation, since Sawyer's trial was not rendered fundamentally unfair by the state trial court's failure to appoint death-qualified counsel. Therefore we need not decide whether the district court's analysis was appropriate. We note that there are certain conceptual difficulties inherent in applying a *Chapman* analysis to a due process claim for, if the violation of state law rendered the trial fundamentally unfair, it would seem that the violation could never be harmless. Because we find no due process violation in the case at bar, however, we see no need to reconcile the conceptual difficulties, or to determine whether harmless error analysis can ever be appropriately applied to a due process claim.

**12.** The remainder of the opinion and the result represent the views of the panel majority, Judges Gee and Davis. The views of Judge King are set forth in her appended dissent.

take Bobby Caldwell out in the front of this Courthouse in moments and string him up and that is terribly, terribly unfair. For they know, as I know, and *as Judge Baker has told you,* that the decision you render is *automatically reviewable* by the Supreme Court. Automatically, and I think it's unfair and I don't mind telling them so.

*Caldwell,* 472 U.S. at 325–26, 105 S.Ct. at 2637–38 (emphasis added).

The Supreme Court, speaking through Justice Marshall—whose consistent view has long been that capital punishment is forbidden by the Constitution in any case whatever—declared this capital sentence unenforcible because it was imposed by a jury that had been misled by the judge and prosecutor about its critical and central role in the sentencing procedure. Concluding that the prosecutor's comments rendered the sentencing proceeding fundamentally unfair, a divided court required resentencing.

A considerable extension of *Caldwell* would be required to accommodate Sawyer's contentions. In our view, a most critical factor in *Caldwell* was the trial judge's approval and encouragement of the prosecutor's tendentious response to defense counsel's spread-eagled oratory.[13] As our Brethren of the Eleventh Circuit have observed:

> Because of the trial judge's agreement with the prosecutor's comments, it was as if the jury received an erroneous instruction from the court at the sentencing phase of a capital proceeding, thus ... mandating reversal.

*Tucker v. Kemp,* 802 F.2d 1293, 1295 (11th Cir.1986) (en banc), *cert. denied,* —— U.S. ——, 107 S.Ct. 1359, 94 L.Ed.2d 529 (1987).

The Supreme Court took a similar view of the passage, observing that the judge "not only failed to correct the prosecutor's remarks, but in fact openly agreed with them; he stated to the jury that the remarks were proper and necessary, strongly implying that the prosecutor's portrayal of

the jury's role was correct." *Caldwell,* 472 U.S. at 339, 105 S.Ct. at 2645. The comparable proceedings here, while falling short of perfection as do most actual trials, are a far cry from those in *Caldwell.* The respect in which they approach it most closely is in the remarks of the prosecutor; in all other respects of significance, they resemble if not at all. We do not condone the remarks in question and we shall discuss them in a moment. Before doing so, however, we think it appropriate to attempt to put the rule of *Caldwell* into a broader context and to sketch out a general approach for dealing with alleged breaches of it.

A general survey of the authorities indicates, as common sense supports, that the *Caldwell* problem results from prosecutorial attempts to counter a particular set of last-resort arguments by the defense in capital cases. Given that in most such cases verdicts must be unanimous, it necessarily follows that, when all else seems lost, counsel may seek to persuade at least one juror (if no more) that: he or she is being asked to "kill" the defendant, that killing is always wrong, that even evidence that seems absolutely conclusive is sometimes not, that at its best human judgment is fallible, that if the defendant is erroneously executed no correction of the error is possible, and that at all events mercy is better than retribution. Taken together, these are formidable arguments, arguments that can be made in any case whatever, arguments all of which are in varying degrees true. One response which they sometimes evoke from the prosecutor is an exhortation to the jury to view its responsibility as a joint, rather than an individual, one; and several varieties of that response were made in this case, two permissible, one dubious.

The first called on the jury to view itself as the representative of the citizenry, as "we the people," declaring by its verdict that the acts of the defendant in torturing his victim to death were intolerable and

---

**13.** No criticism is implied; counsel had few, if any, other courses open to him and did what he could for his client with his back to the wall.

should call down upon him the full force of the law. Another such argument appealed to their group spirit as jurors, assuring them that they did not stand alone in whatever they did but rather functioned together as an institution:

> It's all your doing. Don't feel otherwise. Don't feel like you are the one, because it is very easy for defense lawyers to try and make each and every one of you feel like you are pulling the switch. That is not so.

So far, so good; fair argument.

■ The next sentence, however, embarks upon a far different and more dubious sort of "joint responsibility" argument, one that vaguely and generally reassures the jury that "if you are wrong in your decision, believe me, there will be others who will be behind you to either agree with you or to say you are wrong...." Who these "others" were, the jury was not told. In addition, at various points in the argument the prosecutor improperly referred to the jury's verdict as a "recommendation," and at another as "only the initial step." No objection was made by the defense at any of the foregoing points.

Following them, however, defense counsel advised the jury in his closing argument that:

> The decision whether Robert Sawyer lives or dies is in your hands....
>
> I personally do not agree with the death penalty. I don't think there is any circumstance when anyone has the right to kill another person no matter how we try to get away from it. That is what we would be doing is killing another person.... I'm going to ask you to give Robert Sawyer the living death of life imprisonment. Don't kill. Thank you.

After the prosecutor's closing argument, in which he advised the jury that it really had no choice but to recommend the death penalty, "no matter how unpleasant or how difficult this type of decision may be for you to make," the judge charged the jury in standard form, directing them to the

evidence as the basis for their decision, describing their forthcoming verdict in one place as a recommendation of sentence and at the other as the imposition of one, and concluding:

> It is your responsibility in accordance with the principles of law I have instructed whether the defendant should be sentenced to death or life imprisonment. Go with Mr. Miller back in the jury room.

So much for the circumstances of how the jury was advised. We turn now to the law.

■ The vice in the argument against which *Caldwell*'s rule is directed is not so much that it minimizes the jury's role in the capital sentencing procedure as that it minimizes it untruthfully.[14] It is all too likely that a lay juror who has been told that panel after panel of judges—right up through the Supreme Court—will automatically "review" his verdict may believe that they "review" it as he decided it, in a plenary fashion. Were he told that the "review" would not at all directly concern itself with the central issue before him, life or death for the accused, he would necessarily feel far less reassurance at the prospect. Where, however, a reading of the record makes clear that the jury was told that the life-or-death decision was up to them and that execution could not be exacted without their permission, we think that *Caldwell* is satisfied.

We think it plain that this was the case as to Sawyer. Both the prosecution and the defense, as well as the trial judge, advised Sawyer's jury that if it chose life imprisonment as its verdict, that was the end of the matter. The defense implored them to do so, and the prosecution—despite various ambiguous statements indicated above—told them it was up to them: "The decision is in your hands."

In the last analysis, the fundamental question, in this as in other habeas cases involving prosecutorial remarks complained of, is whether the petitioner has demonstrated that the remarks "so infected the

---

**14.** See Justice O'Connor, concurring partly and separately in *Caldwell,* 472 U.S. at 341, 105 S.Ct. at 2646.

trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181, 106 S.Ct. at 2472, 91 L.Ed.2d at 157 (quoting from *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). In a *Caldwell* situation, however, we agree with our Brethren of the Eleventh Circuit that because the prosecutor's remarks typically amount to a mis-instruction to the jury on the legal effect of their verdict, the reaction to them of defense counsel and trial judge are of especial importance:

> Of critical importance in *Caldwell* was the fact that the trial judge approved of the prosecutor's comments, stating that it was proper that the jury be told that its decision was automatically reviewable. *See id.; Caldwell v. Mississippi*, 472 U.S. at 325–26, 105 S.Ct. at 2638. Because of the trial judge's agreement with the prosecutor's comments, it was as if the jury received an erroneous instruction from the court at the sentencing phase of a capital proceeding, thus triggering the Eighth Amendment's heightened requirement of reliability in a capital case and mandating reversal.[2]

> [2] The Court in *Caldwell* noted that in *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974), the trial judge took special pains to correct the prosecutor's impropriety, giving the jury a strong curative instruction. In contrast, in *Caldwell*, the trial judge "not only failed to correct the prosecutor's remarks, but in fact openly agreed with them; he stated to the jury that the remarks were proper and necessary, strongly implying that the prosecutor's portrayal of the jury's role was correct." *Caldwell v. Mississippi*, 472 U.S. at 2645, 105 S.Ct. at 340.

*Tucker*, 802 F.2d at 1295.

Indeed, the only instance of reversal for a *Caldwell* violation in our Circuit to which we are cited or which our researches have located is *Wheat v. Thigpen*, 793 F.2d 621 (1986), in which the trial court approved the making of such an argument over defense counsel's objection:

> Again, I say to you, and then I'll leave it to you, just remember this, if your verdict is that of the death penalty, that's not final. There's so many more people who will look at this case after you have made your decision in this case. Others will look at it, and look at your

> work, and see if you've made the right decision. And I can assure you, Ladies and Gentlemen, that if one finds that you have not, that they will send him back, and tell us to try it over, because someone made a mistake.
>
> BY MR. STEGAL: May It Please The Court, I'm gonna object to that again. He's telling this jury to go ahead and do something even if it's wrong, because if it's wrong, they're gonna send it back. That's not right. I'm gonna object.
>
> BY THE COURT: I think the argument was allowed—it was opened up on your argument. I'll overrule it.

793 F.2d at 628.

In so stating we do not, of course, intend to say that reversal is never appropriate in the case of a *Caldwell*-type misstatement unless it has been futilely objected to or endorsed as proper or correct by the trial judge. Each case must be evaluated on its own facts and circumstances; and it is not impossible to imagine statements by a prosecutor that, even absent an objection, minimize the jury's role to such a degree as to require reversal if left uncorrected. Even in *Caldwell*, however, where the trial court had overruled an objection and in doing so expressly endorsed the prosecutor's minimizing remarks, the Supreme Court emphasized that his remarks were "quite focused, unambiguous, and strong." 472 U.S. at 340, 105 S.Ct. at 2645. And indeed they were: beginning with two accusations of duplicity on the part of the defense, the argument proceeds through an attack focused on the defense's "insinuating" that the jury's decision was final, invokes the trial judge's already-expressed approval of its somewhat misleading statements, and winds up by assuring the jurors that their decision is "automatically reviewable by the Supreme Court." By contrast, the prosecutor's vague references in today's case to "others who will be behind you" and the like pale into relative insignificance.

The prosecutor in today's case indulged in no claim that the defense was disingenuously or cynically attempting to mislead the jury, as did his comparable figure in *Caldwell*. Nor did counsel raise any objec-

tion, futile or otherwise, to any of the prosecutor's remarks to which Sawyer now takes exception; and the trial court neither approved nor endorsed them. By contrast to the prosecutor's statements in *Caldwell*, which were quite focused, unambiguous and strong—trumpeting automatic review by the Supreme Court and accusing the defense of deliberately misleading the jury as to its role—these were vague and ambiguous. And although we agree with the federal district court that the prosecutor's remarks complained of were improper, we also agree that they did not constitute reversible error—error that so infected the trial as to deny due process.[15]

## IV.

For the foregoing reasons, we AFFIRM.

KING, Circuit Judge, dissenting in part:

I respectfully dissent from the majority's conclusion that the prosecutor's undeniably improper remarks about the finality of the death penalty determination did not violate the eighth amendment as interpreted and applied by the Supreme Court in *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). I have several major concerns with the majority's analysis. First, by applying the fundamental fairness test of *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974), instead of the "no effect" test of *Caldwell*, the majority has reviewed the prosecutor's comments in this case under the wrong standard. Second, by holding that "a most critical factor in *Caldwell* was the trial judge's approval" of the prosecutor's remarks, the majority has adopted an artificially narrow and incorrect interpretation of *Caldwell*—an interpretation which effectively eviscerates the holding in that case. Third, the majority has also mischaracterized the prosecutor's comments here in order to force them outside the ambit of *Caldwell*. And finally, the majority has erroneously implied that other remarks by the trial court, prosecutor and defense counsel were sufficient to cure the comments of any constitutional impropriety.

*The Prosecutor's Argument*

The majority opinion gives the facts of the alleged *Caldwell* violation short shrift. But I think it is important to understand exactly what the prosecutor said here. The comments at issue were made by the prosecutor in his closing argument at the sentencing phase of Sawyer's capital trial. The prosecutor, in describing the jury's role, remarked:

The law provides that if you find one of these circumstances then *what you are doing as a juror, you yourself will not be sentencing Robert Sawyer to the electric chair. What you are saying to this Court, to the people of this Parish, to any appellate court, the Supreme Court of this State, the Supreme Court possibly of the United States*, that you the people as a fact finding body from all the facts and evidence you have heard in relationship to this man's conduct *are of the opinion that there are aggravating circumstances as defined by the statute, by the State Legislature that this is the type of crime that deserves that penalty. It is merely a recommendation* so try as he may, if Mr. Weidner tells you that each and every one of you

---

**15.** The dissent in *Tucker* argued for a "no effect" standard for reversal, based on a concluding phrase at 472 U.S. at 341, 105 S.Ct. at 2646 in the *Caldwell* majority opinion, "Because we cannot say that this effort [to minimize the jury's sense of responsibility] had no effect on the sentencing decision, that decision does not meet the standard of reliability that the eighth amendment requires." 802 F.2d at 1298.

There is no gainsaying that the phrase appears in *Caldwell*, or that it can be read as Judge Kravitch and her two companions in dissent would read it. For a variety of reasons, however, we are not persuaded that the Court intended to impose such a well-nigh impossible burden upon the State as one to show, on pain of reversal, that any remark by a prosecutor in argument that might have a tendency to minimize the jury's sense of responsibility in a capital case had "no effect" on its sentencing decision. Such a test, for example, would make objecting a doubtful tactic, for an objection might bring a correcting instruction or one to disregard, thus removing the remark as a valid ground for appeal. Nor do we see how such a "no effect" test can lie in bed with the requirement, reiterated after *Caldwell* in *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2472, 91 L.Ed.2d 144, 157 (1986), that to obtain habeas relief on the basis of improper remarks by the prosecutor, petitioner must show that they so infected the trial as to deny due process.

I hope you can live with your conscience and try and play upon your emotions, you cannot deny, it is a difficult decision. No one likes to make those [sic] type of decision but you have to realize if but for this man's actions, but for the type of life that he has decided to live, if of his own free choosing, I wouldn't be here presenting evidence and making argument to you. You wouldn't have to make the decision (emphasis supplied).

The prosecutor went on to describe the brutal nature of the crime and, briefly, its impact on the victim and her mother. Then, once again turning to the function of the jury, the prosecutor stated:

There is really not a whole lot that can be said at this point in time that hasn't already been said and done. The decision is in your hands. *You are the people that are going to take the initial step and only the initial step and all you are saying to this court, to the people of this Parish, to this man, to all the Judges that are going to review this case after this day,* is that you the people do not agree and will not tolerate an individual to commit such a heinous and atrocious crime to degrade such a fellow human being without the authority and the impact, the full authority and impact of the law of Louisiana. *All you are saying is that this man from his actions could be prosecuted to the fullest extent of the law. No more and no less* (emphasis supplied).

Finally, after arguing that a death penalty would be justified in this case, the prosecutor noted:

It's all your doing. Don't feel otherwise. Don't feel like you are the one, because it

is very easy for defense lawyers to try and make each and every one of you feel like you are pulling the switch. That is not so. It is not so and *if you are wrong in your decision believe me, believe me there will be others who will be behind you to either agree with you or to say you are wrong* so I ask that you do have the courage of your convictions (emphasis supplied).

*Caldwell, Donnelly and Darden*

In *Caldwell,* the Supreme Court held "that it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Caldwell,* 472 U.S. at 328–29, 105 S.Ct. at 2639. The Court noted that the capital sentencing scheme is premised on a "[b]elief in the truth of the assumption that sentencers treat their power to determine the appropriateness of death as an 'awesome responsibility' [which allows the] Court to view sentencer discretion as consistent with— and indeed as indispensable to—the Eighth Amendment's 'need for reliability in the determination that death is the appropriate punishment in a specific case.' " *Id.* at 330, 105 S.Ct. at 2640 (quoting *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) (plurality opinion)). The Court went on to specify a number of "specific reasons to fear substantial unreliability as well as bias in favor of death sentences when there are state induced suggestions that the sentencing jury may shift its sense of responsibility to an appellate court." *Caldwell,* 472 U.S. at 330, 105 S.Ct. at 2640.[1] Turning to

---

1. Initially, the Court recognized that "[b]ias against the defendant clearly stems from the institutional limits on what an appellate court can do—limits that jurors often might not understand." *Caldwell,* 472 U.S. at 330, 105 S.Ct. at 240. The Court also noted that "[e]ven when a sentencing jury is unconvinced that death is the appropriate punishment, it might nevertheless wish to 'send a message' of extreme disapproval for the defendant's acts. This desire might make the jury very receptive to the prosecutor's assurance that it can freely 'err because the error may be corrected on appeal.' " *Id.* at 331, 105 S.Ct. at 2641 (quoting *Maggio v.*

*Williams,* 464 U.S. 46, 54–55, 104 S.Ct. 311, 316, 78 L.Ed.2d 43 (1983)). A defendant could be executed, therefore, although no sentencer had ever made a determination that death was the appropriate sentence. The Court also raised the possibility that the jury, assuming that only a death sentence will be reviewed, might "understand that any decision to 'delegate' responsibility for sentencing can only be effectuated by returning that sentence." *Caldwell,* 472 U.S. at 332, 105 S.Ct. at 2641. The sentence that would emerge from such a proceeding would not represent a decision that the appropriateness of the defendant's death had been demonstrated; rath-

the facts before it, the Court concluded that the prosecutor's comments sought to give the jury a view of its role in the capital sentencing procedure that was fundamentally incompatible with the eighth amendment's heightened need for reliability. *Id.* at 340, 105 S.Ct. at 2645. As the Court "[could not] say that [the State's] effort had no effect on the sentencing decision," it was compelled to vacate the death sentence. *Id.* at 341, 105 S.Ct. at 2646.

In reaching its conclusion, the Court was careful to distinguish, on two separate grounds, the fourteenth amendment fundamental fairness inquiry of *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974), from the case before it. First, the trial judge in *Donnelly* had agreed that the prosecutor's remarks in that case were improper and had given the jury a strong curative instruction. By contrast, in *Caldwell,* the trial judge not only failed to correct the prosecutor's remarks, but in fact openly agreed with them. *Caldwell,* 472 U.S. at 339, 105 S.Ct. at 2645. Second, the prosecutor's remarks in *Donnelly* were ambiguous and did not so prejudice a specific constitutional right as to amount to a denial of that right. The remarks in *Caldwell,* in contrast, "were quite focused, unambiguous, and strong" and "were pointedly directed at the issue that [the] Court has described as 'the principal concern' of [its] jurisprudence regarding the death penalty, the procedure by which the State imposes the death sentence." *Id.* at 340, 105 S.Ct. at 2645 (citation omitted).

The Court subsequently clarified the reach of *Caldwell* and *Donnelly* in *Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). In *Darden,* the Court was confronted by a variety of challenges to the prosecutor's closing argument at the guilt phase of a capital murder trial. The Court relied on *Donnelly* in treating the relevant question as "whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden,* 106 S.Ct. at 2472 (quoting *Donnelly,* 416 U.S. at 643, 94 S.Ct. at 1871). The *Darden* majority was quite careful, however, to distinguish the facts in front of it from those in *Caldwell.* [2] The *Darden* Court specifically limited *Caldwell* "to certain types of comment—those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision." *Darden,* 106 S.Ct. at 2473 n. 15. As the prosecutor's comments in *Darden* did not mislead the jury as to its role in the sentencing decision, *Caldwell* was inapplicable.

*Standard of Review*

I differ with the majority on the appropriate standard by which to review the comments at issue here. The majority, relying on *Darden* and *Donnelly,* holds that the fundamental question, in this case as in other habeas cases involving improper prosecutorial comments, is whether the petitioner has demonstrated that the remarks rendered the trial fundamentally unfair so as to deny due process. [3] A fair reading of

er, the decision would present "the specter of the imposition of death based on a factor wholly irrelevant to legitimate sentencing concerns"—namely the desire to avoid responsibility for the decision. *Id.* Finally, given the fact that a capital sentencing jury is "made up of individuals placed in a very unfamiliar situation and called on to make a difficult and uncomfortable choice," an uncorrected suggestion that the ultimate determination of death rests elsewhere presents "an intolerable danger that the jury will in fact choose to minimize the importance of its role." *Id.* at 333, 105 S.Ct. at 2642.

2. In *Darden,* the Court wrote that:

There are several factual reasons for distinguishing *Caldwell* from the present case. The comments in *Caldwell* were made at the sen-

tencing phase of trial and were approved by the trial judge. In this case, the comments were made at the guilt-innocence stage of trial, greatly reducing the chance that they had any effect at all on sentencing. The trial judge did not approve of the comments, and several times instructed the jurors that the arguments were not evidence and that their decision was to be based only on the evidence.

*Darden,* 106 S.Ct. at 2473 n. 15.

3. The genesis of this proposition may be found in the Eleventh Circuit's decision in *Tucker v. Kemp,* 802 F.2d 1293 (11th Cir.1986) (en banc), *cert. denied,* —— U.S. ——, 107 S.Ct. 1359, 94 L.Ed.2d 529 (1987). In *Tucker,* the court "borrowed" the prejudice prong of *Strickland* in

*Caldwell* and *Darden* cannot support this conclusion.

In *Caldwell*, the Court wrote: "Because we cannot say that this effort [to minimize the jury's sense of responsibility for determining the appropriateness of death] had no effect on the sentencing decision, that decision does not meet the standard of reliability that the Eighth Amendment requires." 472 U.S. at 341, 105 S.Ct. at 2646. The majority, while recognizing that the phrase exists and that the "no effect" test is a plausible interpretation of the Court's language, concludes, for a variety of reasons, that the Court could not have meant to place a higher burden on the State in an eighth amendment *Caldwell*-type situation than would otherwise be borne under the due process jurisprudence of *Donnelly* and its progeny. I find the majority's reasoning unpersuasive.

The majority argues that the adoption of the "no effect" test would impose a "well-nigh impossible burden upon the State." According to the majority, the State would be forced to show that *any* remark which tended to minimize the jury's sense of responsibility in a capital case had no effect on the sentencing decision. That is not so. In order to qualify as a *Caldwell* violation, the prosecutor's remarks concerning the jury's role must be "focused, unambiguous and strong." *Id.* at 340, 105 S.Ct. at 2645. Moreover, the remarks would typically be made at the sentencing phase of trial rath-

er than during voir dire, *see Byrne v. Butler*, 845 F.2d 501, 509 (5th Cir. 1988), or during the guilt-innocence stage, *see Darden*, 106 S.Ct. at 2473 n. 15. Finally, the remarks must not be corrected by an appropriate instruction from the trial court. *Caldwell*'s "no effect" test, therefore, is limited to a subset of particularly forceful prosecutorial comments on a narrow topic, generally presented to a capital jury at the sentencing phase of trial, which are not corrected by the trial court. So, while the burden on the State may in fact be "well-nigh impossible," it is borne only in a narrow class of cases.

The majority also argues that the "no effect" test cannot be squared with *Darden*'s reaffirmation of the *Donnelly* test in *most* cases involving improper remarks by a prosecutor. The principles of *Caldwell*, however, were not applicable in *Darden*. *Darden*, 106 S.Ct. at 2473 n. 15. Since the prosecutor's comments in *Darden* could not have misled the jury into thinking that it had a reduced role in the sentencing process, any eighth amendment argument was unconvincing and the Court felt free to apply the more generally applicable due process standard of review. *Darden* did not hold that the *Donnelly* standard should be applied to *Caldwell* violations. If it had, the Court would not have needed to go to such great lengths to distinguish *Caldwell*.[4] *See id.* It is clear, therefore, that in

---

order to apply the *Donnelly* fundamental fairness standard to *Caldwell*-type violations. *See Tucker*, 802 F.2d at 1295. That decision was roundly criticized by three judges in dissent. The dissenting opinion in *Tucker* discussed a number of shortcomings in the Eleventh Circuit's approach. The dissent noted, for example, that *Strickland* and *Caldwell* are fundamentally different in their assignment of the burden of proving prejudice. *Tucker*, 802 F.2d at 1298 (dissenting opinion). Unlike *Strickland, Caldwell* places the prejudice burden on the State. "Once the petitioner has shown that the prosecution attempted to minimize the jury's responsibility at the capital sentencing hearing, the state must show that 'this effort had no effect on the sentencing decision.'" *Id.* (quoting *Caldwell*, 472 U.S. at 341, 105 S.Ct. at 2646). The dissent also stressed that while "the government is not responsible for, and hence not able to prevent, [defense] attorney errors that will result in reversal," *see Strickland*, 466 U.S. at 693, 104 S.Ct. at 2067, "the state *can* control prosecutorial

conduct and, in the capital sentencing context, is constitutionally obligated to do so." *Tucker*, 802 F.2d at 1298 (dissenting opinion). Finally, the dissent found it significant that the Supreme Court itself "did not apply its *Strickland* prejudice analysis to Caldwell's claim of prosecutorial misconduct at sentencing but instead reaffirmed the long line of cases requiring heightened reliability in capital sentencing proceedings." *Id.*

4. By reviewing Justice Blackmun's dissenting opinion in *Darden*, which was joined by three of the other four members of the *Caldwell* majority, the error in the majority's analysis can be readily discerned. In *Darden*, the dissent charged that the Court rejected "the 'no effect' test set out in *Caldwell*" without identifying which standard it was using. *Darden*, 106 S.Ct. at 2480 (Blackmun, J., dissenting). The Court responded to the dissent's charges by distinguishing *Caldwell* so that it could apply the *Donnelly* standard to the facts before it. At no

the peculiar eighth amendment context of the *Caldwell* violation, a stricter standard of review applies.[5] Prosecutorial comments which truly qualify as *Caldwell* violations cannot be reviewed under the *Donnelly* standard.[6]

### Nature of a Caldwell Violation

I also differ with the majority's description of the nature of what has come to be called a *Caldwell* violation. Not content with *Darden*'s express limitation of *Caldwell* to a particular type of prosecutorial comment at the sentencing phase of trial, the majority would further restrict the reach of *Caldwell* to those rare instances in which the trial court expressly approves the prosecutor's improper remarks. Essentially, the majority would make the trial court's imprimatur a prerequisite to finding a *Caldwell* violation. The majority's position is based on a tortured reading of *Caldwell*.

The majority ignores the fact that the Supreme Court framed the *Caldwell* issue throughout the majority opinion solely in terms of the prosecutor's remarks:

In this case, *a prosecutor urged the jury* not to view itself as determining whether

the defendant would die, because a death sentence would be reviewed for correctness by the State Supreme Court. We granted certiorari ... to consider petitioner's contention that *the prosecutor's argument* rendered the capital sentencing proceeding inconsistent with the Eighth Amendment's 'heightened need for reliability....' "

*Caldwell*, 472 U.S. at 323, 105 S.Ct. at 2636 (emphasis supplied). The majority opinion in *Caldwell* is divided into approximately thirteen parts and subparts, and the only mention of the trial court's endorsement of the prosecutor's remarks is in Part IV–C of the opinion in which the Court sought to distinguish *Donnelly*. While the Court did note that the trial judge had approved the remarks in the case before it, it did not establish that fact as a prerequisite to its ultimate condemnation of the prosecutor's actions. Rather, the Court identified *two* important factors which distinguished *Donnelly*. First, the Court looked at the trial court's actions and found that, unlike in *Donnelly*, the trial court not only failed to correct the improper remarks, it also endorsed them. *Id.* at 339, 105 S.Ct. at 2645. Next, the Court looked to the character of

---

point, however, did the Court take issue with the dissent's characterization of the *Caldwell* standard as a "no effect" test.

5. Justice Rehnquist, in his dissenting opinion in *Caldwell,* clearly believed that the Court had rejected the *Donnelly* standard. Justice Rehnquist "[found] unconvincing the Court's scramble to identify an independent Eighth Amendment norm that was violated by the [prosecutor's] statements," and concluded that "[a]lthough the Eighth Amendment requires certain processes designed to prevent the arbitrary imposition of capital punishment, it does not follow that every proceeding that strays from the optimum is *ipso facto* constitutionally unreliable." *Caldwell,* 472 U.S. at 350–51, 105 S.Ct. at 2650–51 (Rehnquist, J., dissenting). Justice Rehnquist chided the Court for not heeding the directives of *Donnelly* and for not applying a fundamental fairness test. *Id.*

6. The panel's discussion of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and *Rose v. Clark*, 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986), underscores the error in the majority's adoption of a fundamental fairness standard in this case. In *Chapman,* the Court recognized that some errors necessarily render a trial fundamentally unfair. *Rose,*

106 S.Ct. at 3106. There are certain constitutional protections so basic to a fair trial that without them, a criminal proceeding cannot reliably serve its function as a vehicle for the determination of guilt or innocence, and the criminal sanction may not be regarded as fundamentally fair. *Id.* Such errors either abort the basic trial process or deny it altogether. *Id.* at n. 6. The *Caldwell* violation presents a clear example of a breakdown in the trial process. The pernicious effects of focused, unambiguous and strong prosecutorial remarks concerning the jury's role in the sentencing process and the inevitability of appellate review are impossible to measure. Consequently, *where such remarks are left uncorrected by the trial court, there is an intolerable danger that they affected the sentencing decision.* For all the reasons reviewed by the Court in *Caldwell,* such remarks create an unacceptable risk of systemic breakdown, thereby poisoning the reliability of the death sentence. Given that the eighth amendment demands a heightened degree of reliability in any case where the State seeks to take the life of a defendant, the prosecutor's remarks necessarily rendered the proceedings fundamentally unfair. It is our inability to measure the effect of such remarks, combined with the very grave threat to the integrity of the proceedings posed by such remarks, that militates in favor of the "no effect" test.

the remarks and determined that the prosecutor's comments differed from those in *Donnelly* because they were "focused, unambiguous, and strong" and because they prejudiced a specific constitutional right, i.e., an eighth amendment right. *Id.* at 340–41, 105 S.Ct. at 2645–46. The Court went on to confirm that such comments, *if left uncorrected,* might so affect the fundamental fairness of the sentencing proceeding as to violate the eighth amendment. *Id.*

Given *Caldwell*'s overwhelming emphasis on the character and effect of the prosecutor's argument itself,[7] the question of whether the trial court endorsed the comments must be viewed as merely a factor in a larger inquiry. A proper inquiry must focus on the nature of the prosecutor's remarks themselves *and* on the character of the trial court's response to those remarks. Moreover, an evaluation of the trial court's response is not limited to the question of whether the trial court endorsed the remarks. Were this not the case, the Court's references to curative action would be superfluous for silence would be sufficient medicine for what ailed the proceedings. I do not think *Caldwell* can fairly be read, therefore, as holding that the trial court's endorsement of the prosecutor's remarks is a prerequisite to finding an eighth amendment violation.

*Nature of the Prosecutor's Remarks*

The majority, casting the prosecutor's remarks in a more favorable light than they merit, weaves the threads of an admittedly "improper" argument into a harmless tapestry of vague, disjointed and forgiveable[8] prosecutorial comments. My own review of the record has led me to conclude that the prosecutor's remarks in the instant case are sufficiently similar to those found constitutionally wanting in *Caldwell* as to merit vacation of Sawyer's sentence.

In the instant case, the prosecutor told the jury:

> Don't feel like you are the one, because it is very easy for defense lawyers to try and make each and every one of you feel like you are pulling the switch. That is not so. It is not so and if you are wrong in your decision believe me, believe me there will be others who will be behind you to either agree with you or to say you are wrong....

While the majority is arguably correct in dismissing the first portion of this comment as a permissible "joint-responsibility" argument, it is remiss in not recognizing the answer to the query it asks with re-

7. Justice O'Connor, in her concurring opinion, noted that "the prosecutor's remarks were impermissible because they were inaccurate and misleading in a manner that diminished the jury's sense of responsibility." *Id.* at 342, 105 S.Ct. at 2646 (O'Connor, J., concurring). Justice O'Connor's concurring opinion focused exclusively on the prosecutor's remarks, never once mentioning the trial court's endorsement of those remarks.

8. The majority also strives to justify the prosecutor's remarks on the ground of practical necessity. Prosecutors need such arguments, the majority suggests, to deal with the "formidable" argument, typically urged as a "last-resort" by struggling defense counsel, that the decision whether the defendant merits execution rests with each individual juror, that human judgment is not infallible, that mistakes can be made and that death is one error which cannot be corrected. The majority points out, as it must, that such arguments are "in varying degrees" true. Those weighty factors, however, are precisely the sort of considerations which society has entrusted the jury to weigh in reaching its decision. Those decisions are at the core of the heightened need for reliability demanded by the eighth amendment of sentencing proceedings in capital trials.

The prosecutor is free to emphasize the collective nature of the jury decision. He is also free to emphasize that the defendant himself bears the responsibility for the consequences of his actions. The prosecutor most certainly made those arguments in this case. The prosecutor is not free, however, to diminish the jury's sense of the finality of their decision by repeatedly alluding to the specter of appellate review. By doing so, the prosecutor may well leave the jurors with the notion that their moral judgment in favor of death will be reviewed for error. *See Caldwell,* 472 U.S. at 340 n. 7, 105 S.Ct. at 2645 n. 7. This may hold true even when the prosecutor has stressed that "the decision" is in the jury's hands for "the decision" in that case would be the decision to send a message, or the decision to start the ball rolling, or the decision that the jury wants the case reviewed. *See id.* at 330–33, 105 S.Ct. at 2640–41. It would not be the decision demanded by society and required by the eighth amendment: that the defendant merits execution because death is the appropriate punishment for the crime he has committed.

spect to the latter portion: who are the "others" who will be behind the jury to agree with their decision or correct them if they are wrong? The answer is suggested in an earlier comment by the prosecutor:

> ... what you are doing as a juror, you yourself will not be sentencing Robert Sawyer to the electric chair. What you are saying to this Court, to the people of this Parish, to any appellate court, the Supreme Court of this State, the Supreme Court possibly of the United States, that you the people as a fact finding body ... are of the opinion that there are aggravating circumstances as defined by the statute, by the State Legislature that this is the type of crime that deserves that penalty.

Just as the *Caldwell* prosecutor referred to the ultimate reviewability of the jury's determination, so too did the prosecutor here make several unambiguous allusions to the inevitability of appellate scrutiny, naming the potential reviewers as he did so. As if the intended suggestion was not already clear enough, the prosecutor went on to hammer home his point by explicitly referring to judicial review and by couching his description of the jury's decision in language bespeaking possibility rather than finality:

> You are the people that are going to take the initial step and only the initial step and all you are saying to this court, to the people of this Parish, to this man, to all the Judges that are going to review this case after this day.... All you are saying is that this man from his actions could be prosecuted to the fullest extent of the law. No more and no less.

The contested remarks here are precisely the sort of comments condemned in *Caldwell* as tending to impart to the jury a view of its role in the capital sentencing procedure that is fundamentally incompatible with the eighth amendment's heightened need for reliability in the death sentence determination. It is unnecessary to decide whether any one remark violated *Caldwell* for it is readily apparent that the prosecu-

tor's repeated references to appellate review and the jury's limited role in the death sentence calculus surely did so. When viewed in their totality, the remarks appear "focused, unambiguous, and strong." *See Caldwell*, 472 U.S. at 340, 105 S.Ct. at 2645. The prosecutor clearly sought to leave the jury with the notion that their recommendation of death would be merely "the initial step" and that the "others who will be behind" them would be there to correct any error in that determination. The message of non-finality was clear.

*The Trial Court's Response*

Having determined that the prosecutor's remarks were inappropriate under *Caldwell*, a question remains whether subsequent action by the trial court was sufficient to preclude reversal. *See Caldwell*, 472 U.S. at 339–40, 105 S.Ct. at 2645; *see also Bell v. Lynaugh*, 828 F.2d 1085 (5th Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 310, 98 L.Ed.2d 268 (1987). The majority notes that the trial court delivered a standard form jury instruction informing the jury that it was their responsibility to deliver a sentence of death or life imprisonment. While that much is true, it is equally clear that the trial court did little if anything to correct the damage that was done. This is particularly so with respect to the prosecutor's comments regarding appellate review. Even if the trial court's instructions left the jury with the view that they had an important role to play, they did nothing to undermine the prosecutor's suggestion that the jury's determination would be reviewed by an appellate court to assure its correctness. *See Caldwell*, 472 U.S. at 340 n. 7, 105 S.Ct. at 2645 n. 7.

This is not a case where the trial court admonished the jury to disregard the prosecutor's comments. Nor is this a case where the trial court meticulously instructed the jury on the errors in the prosecutor's argument. I do not presume to establish a general standard by which to judge the efficacy of a trial court's curative instructions in a *Caldwell* violation context. I merely note that in the instant case, the trial court's instructions [9] were insufficient

---

**9.** The majority, in an effort to bolster its position that the prosecutor's remarks were later

"cured", points to the fact that *defense* counsel informed the jury that "[t]he decision whether

to disabuse the jury of the notion that final responsibility for the sentencing decision might lay elsewhere.

In summary, because I believe that the prosecutor's effort to minimize the jury's sense of responsibility for determining the appropriateness of death cannot be said to have had no effect on the sentencing decision, I believe that the writ must be granted as to the sentence imposed upon Sawyer. I dissent from the majority's decision to affirm the district court's denial of the writ.

## ON SUGGESTION FOR REHEARING EN BANC

Before CLARK, Chief Judge, GEE, RUBIN, REAVLEY, POLITZ, KING, JOHNSON, WILLIAMS, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, JONES, and SMITH, Circuit Judges.

BY THE COURT:

A member of the Court in active service having requested a poll on the suggestion for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc,

IT IS ORDERED that this cause shall be reheard by the Court en banc with oral argument on a date hereafter to be fixed. The Clerk will specify a briefing schedule for the filing of supplemental briefs.

Robert Sawyer lives or dies is in your hands." That remark was patently insufficient to relieve the jurors of any mistaken impressions they might have held as to their role in the death penalty determination. In fact, any initial confusion by the jury might well have been exacerbated by defense counsel's espousal of a position contrary to that which the prosecutor seemed to embrace. The jury may have understood the remark, made just after the prosecutor had finished insinuating that the jury's decision was not final, to signify the existence of a true dispute on the role of the jury. Therefore, defense counsel's remark, when considered along with the prosecutor's earlier comments, may well have added to the cloud of uncertainty billowing around the jury about its own role. Consequently, the majority's reliance on the curative properties of defense counsel's remark is misplaced.